500 So.2d 1232 (1986)
Robert Lee TARVER, Jr.
v.
STATE.
4 Div. 504.
Court of Criminal Appeals of Alabama.
June 10, 1986.
Rehearing Denied July 15, 1986.
*1235 Robert P. Lane, of Phillips & Funderburk, Phenix City, for appellant.
Charles A. Graddick, Atty. Gen., and Mary Ellen Fike Forehand and William D. Little, Asst. Attys. Gen., for appellee.
TYSON, Judge.
Robert Lee Tarver, Jr. was indicted for the intentional murder of Hugh Sims Kite, during the course of a robbery, in violation of § 13A-5-40(a)(2), Code of Alabama 1975. The jury found the appellant "guilty as charged in the indictment" during the guilt phase of the trial. At the sentencing phase, the jury recommended the appellant receive a sentence of life imprisonment without parole.
The trial judge rejected the jury's recommendation at the sentencing hearing. He determined the aggravating circumstances outweighed the mitigating circumstances and sentenced the appellant to death.
The victim, Hugh Sims Kite, owned Kite's Store on Highway 165 in Cottonton, Alabama. On the evening of September 15, 1984, Jerry Ford, a ten-year-old boy, was helping the victim at his store. As the victim prepared to close the store, he told Ford to stand out front while he put some ice in the back of his truck which was parked behind the store.
While Ford was waiting in the front of the store, he heard two shots. Ford went around to the back of the store and called for the victim but he did not get an answer. Ford returned to the front of the store and remained there until Bennie Davis came by the store.
This same night, Cynthia Sue Howard and her husband were camping in a pasture south of the railroad tracks from Kite's Store. Around 9:15 p.m. (Eastern time), Howard saw some car lights in the pasture about 300 yards away. Some 30 to 45 minutes later, she heard four gunshots.
Bennie Davis testified that he stopped at Kite's Store on the night of September 15, 1984. After finding no one inside the store, Davis asked Ford where the victim was. Ford replied that he had heard some shots after the victim went behind the store.
Ford then got a flashlight for Davis and Davis went behind the store and found the victim lying on the ground. Davis contacted the police and remained at the scene until they arrived.
Sollie Pate, a deputy with the Russell County Sheriff's Department, testified that, on the evening in question, he was at his home which is about a mile from Kite's Store. At 10:30 p.m. (Eastern time), he received a call from the dispatcher that someone had been shot at Kite's Store. Pate went to the scene and, upon his arrival, he found no pulse on the victim. He then secured the scene and called for an ambulance, the coroner and the investigators. Pate saw some ice in the back of the victim's truck.
Lesley Vance, the Russell County Coroner, testified that he examined the victim's body at the scene. Vance found three gunshot wounds on the victim and determined the victim was dead.
Vance stated that the victim's wallet was found on his body and that there was money lying outside the victim's left pocket. Vance was later recalled to the stand and stated that his earlier testimony about finding the victim's wallet was incorrect. He stated that the victim's wallet was not found.
*1236 Raymond Smith, an investigator with the Russell County Sheriff's Department, testified that he took photographs of the scene and the victim's body. Smith felt something in the victim's right front pocket which appeared to be folded paper and change in the left front pocket. The victim's two rear pockets were empty and the left pocket had been turned three-quarters inside out. The inside part of the pocket had been pulled outside the opening of the pocket. Some money was found lying between the victim's left hip and knee. Next to the victim's left foot, Smith saw two credit cards, a Master Card and a Visa. The victim's wallet was not found.
Smith noticed shoe prints, with a distinctive tread design, leading away from the vicinity of the area where the victim was found. The prints led south from the store across the railroad tracks and onto a dirt road in a pasture which was owned by the victim. The shoe prints were also found leading from the pasture towards the store. The shoe prints were tracked to an area where Smith found scratch marks from a vehicle in the dirt. The scratch marks indicated that the vehicle had left at a high rate of speed. The tire prints led to the highway and it appeared the vehicle proceeded onto the highway in a southerly direction. Tire prints of all four tires could be seen and the tires all seemed to be different.
An attempt was made to locate shoes in area stores which had the same tread design as the shoe prints. These efforts were unsuccessful.
The tires of area vehicles and the parking lots of several country stores were checked in an attempt to locate similar tire prints to those found in the pasture. These efforts, too, proved to be fruitless.
While making a search of the pasture, Smith found a Salem cigarette butt in the grass area where the vehicle that made the tire prints had been parked. The butt appeared to be fresh because the ash of the cigarette was in good, complete condition and was lying right off of the end of the butt.
On October 11, 1984, Thomas Boswell, the chief investigator for the Russell County Sheriff's Department, received some information concerning this case from a Robert Jackson. Based on this information, Boswell asked Investigator Herbert Parker to locate Andrew Richardson.
Richardson was located and came to the Sheriff's office and made a statement. Following his statement, Richardson was arrested for the victim's murder.
Boswell then went to the residence of Esther Dennis and asked her about a gun. After Richardson, who had accompanied Boswell, made a comment to Dennis, she produced a Colt single shot revolver. The gun was unloaded.
Boswell also went to the home of Addie Upshaw, the occasional residence of the appellant. At Upshaw's residence, a Chevrolet automobile was found with a distinctive set of tires which had characteristics similar to the tire prints found in the pasture. The car was impounded and towed to the jail yard.
A search of Upshaw's home was made and a pair of Nike tennis shoes was found. The tread on these shoes looked similar to the shoe prints in the pasture.
Boswell testified that, on October 4, 1984, a request had been made to the Governor to authorize payment of a reward for information leading to the arrest of a suspect in the victim's murder. However, Boswell stated that Jackson never mentioned a reward. In fact, Boswell already had the name of the appellant along with 25 other names, when he talked to Jackson.
Boswell testified that Richardson has also been indicted for the victim's murder.
Esther Dennis testified that the appellant came to her house alone one Saturday afternoon and asked to borrow her gun. She lent it to him and he returned it about a week and a half later. Richardson was with the appellant when he returned the gun.
Dennis stated that she didn't remember if the gun was loaded when the appellant *1237 borrowed it or if he borrowed it before or after the victim was killed.
Dr. Thomas Gilchrist performed the autopsy on the victim. His examination revealed the victim had sustained a gunshot wound to the chest and two gunshot wounds to the right thigh. Gilchrist removed two bullets from the victim's body. The third bullet had exited the body. Gilchrist determined the victim's cause of death to be a gunshot wound to the chest.
Lonnie Harden, a firearms and toolmark examiner for the Department of Forensic Sciences, examined the two expended .38 bullets which were removed from the victim's body and test fired the gun which was obtained from Dennis. He determined that the two bullets had been fired through this particular gun.
Harden also examined the shirt and pants the victim was wearing on the night of his death. He found no gunpowder residue around the bullet holes in the shirt and pants. This indicated to Harden that the gunshots had been fired from a distance of in excess of 30 inches away.
Joe Edwards, a Phenix City police officer, assisted the district attorney's office in this investigation. He testified that, on the morning of September 16, 1984, he found a Budweiser beer can beside the tire tracks in the pasture behind Kite's Store. When he poured the beer from the can, it began to foam. This indicated to Edwards that the beer in the can was relatively fresh.
Gloria Walters, a latent print examiner with the Alabama Bureau of Investigation, lifted a latent fingerprint from the Budweiser can. This print matched the known fingerprint of the appellant's right thumb.
John Perdue testified that he is a trooper with the ABI and he assists law enforcement agencies in criminal investigations. He participated in the investigation of the victim's death. He stated that he was present during the interviews of Richardson and the appellant. During these interviews, he made notes that both Richardson and the appellant smoked Salem cigarettes.
Tellis Hudson, a criminalist with the DFS, assisted in the investigation. He examined the shoe prints found in the pasture and made photographs of the prints. He also made a plaster cast of one of the shoe prints.
Hudson stated that the shoe prints had an unusual tread design. He also said that part of the impression of the shoe print was probably made by the person's pants' legs being too long and dragging the ground.
Hudson compared the Nike tennis shoes to photographs of the shoe prints found in the pasture. He stated that the tread design of the tennis shoes was fairly similar to the design of the shoe prints but they did not match.
Hudson also examined and made photographs of the tire tracks in the pasture. He also examined the tires of the Chevrolet and made tire prints from these tires. By comparing these tire prints to photographs of the tire tracks found in the pasture, Hudson determined that one of the prints in the pasture could have been made by the left, and possibly the right, front tire of the Chevrolet.
Prentiss Griffith, the Sheriff of Russell County, also examined the shoe prints which were found leading back and forth between the pasture and the rear of Kite's Store. He stated that the stride of the prints leading away from the store to the pasture were longer than those leading from the pasture to the store. This indicated to him that the person was running away from the store.
Griffith said that his observation of the tire prints indicated that the vehicle turned into the pasture from Highway 165 onto a dirt road. The vehicle proceeded down the dirt road until it forked. The vehicle then pulled in the middle of the fork next to a tree and then backed into a grassy area. When the car left the pasture, it turned south onto Highway 165.
Griffith examined the tires of the Chevrolet when it was parked in the jail yard. This vehicle's tires' tread design and wear *1238 had the same characteristics as the prints found in the pasture.
Griffith stated that it had rained in the area on the afternoon of the victim's death. The rain had covered all prints in the area except the ones found.
Andrew Richardson testified that the appellant came to his house at 8:00 p.m. (Central time) on the evening of September 15, 1984. The appellant asked Richardson to go for a ride and said he wouldn't be gone long. He stated he had some business to do with a white man.
The appellant had with him some coveralls, a wig and a stocking mask. He put on these items and asked Richardson if he would fool anyone. The two then left Richardson's house in the appellant's Chevrolet. The appellant drove down Highway 165 and passed Kite's Store. They drove to ML's Club where Richardson went inside to find his brother.
When Richardson returned to the car, the appellant drove back down Highway 165 and turned off into a pasture. The appellant drove down a dirt road and then backed up the car and headed it towards the highway.
The two sat and talked for a while. The appellant was drinking a Budweiser beer at this time.
At some point, the appellant told Richardson that he hated to do it but he had to, and told Richardson to take his car home and park it if he didn't come back.
The appellant then got out of the car and put on the wig and mask. He then headed towards Kite's Store. Approximately five to 10 minutes after the appellant left, Richardson heard three shots. Although scared, Richardson remained at the car until the appellant returned.
When the appellant got back to the car, he did not have the mask or the wig. He told Richardson to drive after he got in the passenger seat. As Richardson was driving, the appellant told him to stop. The appellant then left his clothes in some bushes.
When the appellant got back to the car, he told Richardson that he had messed up and killed the victim.
Richardson then drove to his house. The appellant counted some money and gave Richardson $80. He stuck the gun in the inside arm of the couch in Richardson's house.
The two then went to Mary's Lounge. After the lounge closed, Richardson went to Robert Hardaway's house and the appellant went to see a girl friend.
The next day, Richardson accompanied the appellant and Bossie Edmonds to the appellant's mother's house in Brundidge. Once there, the appellant stayed and Richardson and Edmonds returned home.
The following Friday, the appellant came to Richardson's house and got the gun from the couch. Richardson went with the appellant to return the gun to Dennis. On the way home, the appellant told Richardson that, if he said anything about it, he'd wind up the same way.
Richardson told Robert Jackson what happened. Some time later, he came to the Sheriff's office with Officer Parker and Jackson. Richardson testified that he had been indicted for this offense and he had not been promised anything in exchange for his testimony.
Richardson admitted to some inconsistencies between his statement and his testimony. He also stated that he sometimes wears his pants legs rolled up.
Bossie Edmonds testified that he drove the appellant to Brundidge the day after the victim was killed. He stated that Richardson rode with them. When Edmonds dropped off the appellant at his mother's house, he gave Edmonds a $20 bill. Edmonds also saw some additional money folded in the appellant's hand. Edmonds then drove Richardson home.
Robert Jackson testified that he and Richardson were raised together and Richardson told him what had happened concerning the victim's death. Jackson told Richardson to turn himself in. The next day, Jackson contacted Officer Parker.
*1239 Parker came to his house and waited for Richardson. When Richardson arrived, Jackson told him Parker needed to see him and Richardson agreed. Jackson then went to the Sheriff's office with Parker and Richardson.
Jackson stated that he was unaware of the reward when he talked to Richardson. He stated that he had not asked for the reward but he thought he'd probably receive it.
Officer Parker took possession of the personal effects of the victim on the night in question. Inside and just outside the victim's left front pocket, there were $36 in $1 bills, $50 in $5 bills, and $3.96 in change and a set of keys. In the right front pocket, there were $15 in $1 bills, $50 in $5 bills, and 35 cents in change, along with two sets of keys, some medication and a pocketknife. Next to the victim's left leg, there were a Master card and a Visa credit card. No wallet was found on the victim.
Parker interviewed the appellant on October 12, 1984. The appellant was told Parker was investigating the murder of the victim. He was advised of his Miranda rights and the waiver of those rights. The appellant stated that he understood his rights and signed this waiver. Parker testified that no threats, inducements, or promises were made to the appellant in return for his statement.
During this interview, the appellant told Parker that he was nowhere near Cottonton on the night in question. He said that he had been at Mary's Lounge that night playing pool with Richardson from 7:00 p.m. until 3:00 a.m. He stated that he drank Budweiser that night and Richardson drank whiskey.
The appellant stated that he spent the night with his girl friend. He went to Brundidge after he was told by Bruce Person that the victim had been killed.
Once the appellant was told that they (the investigators) had talked to Richardson, he became very nervous. When the appellant was charged with the victim's murder, he said he had nothing else to say. The appellant also told Parker that he'd been out of work one month before the victim was killed.
Parker acknowledged several differences between Richardson's statement and his testimony.
Alberta Williams testified that she was at ML's Club on the night of September 15, 1984. At approximately 10:00 or 10:30 p.m., she heard three shots. She said she did not see Richardson or the appellant's car at ML's Club that night.
Robert Hardaway testified that he was at Mary's Lounge on the night in question from 7:00 p.m. until 1:00 a.m. (Central time). He did not see Richardson and the appellant at Mary's until 11:30 or 12:00. He said Richardson's pants legs were not rolled up that night.
Clarence Diggs, Jr., was the DJ at Mary's Lounge on September 15,1984. He said no one played pool once the music started playing.
Hugh Sims Kite, Jr., testified that he was the victim's son and sometimes worked at his father's store. He stated that he was familiar with his father's habits about the store money and his personal money. Kite said his father had a wallet and kept it in his left hip pocket. His father kept large bills and other money for special purposes in his wallet. He also carried money elsewhere on his person.
Kite saw his father early on the evening of his death. The victim and his son had a $3,000 obligation to meet and the victim told his son that he thought he had enough money to meet this obligation.
Kite saw his father's wallet that night when his father pulled it out to give him some money. However, Kite told his father to keep the money until the next day.
At this point, the State rested its case.
Addie Upshaw, the appellant's grandmother, testified that the appellant was living with her on September 15, 1984. Two cancelled checks made out to the appellant and signed by Upshaw were admitted into evidence. Upshaw stated that *1240 these checks were paid to the appellant for working around her house.
Debra Upshaw, Addie Upshaw's daughter and the appellant's aunt, testified that she was at her mother's house on the afternoon of September 15, 1984. That afternoon, the appellant and Richardson were at the house. The appellant told Upshaw that there was a gun in the pocket of the chair in which Richardson was sitting. He said the gun was for protection.
Upshaw testified that the Chevrolet initially belonged to her but she had given it to the appellant.
Upshaw stated that she brought to court with her the personal articles of the appellant that she had signed for at the Russell County Jail. One of the items that she had was a bullet.
During the State's rebuttal, two witnesses, Bill Landreau and Tom Woodard of the Russell County Sheriff's Department, stated that they had seen the bullet which the appellant had at the jail, which was released to Upshaw. They testified that the bullet they had seen was a revolver bullet. However, the bullet Upshaw brought to court was a rifle bullet.
Cleopus Jones testified that he worked at ML's Club on the evening of September 15, 1984. He stated that Richardson never came into ML's Club that night.
Rosa Henry, the wife of the owner of ML's Club, was also working at ML's on the evening of September 15. She didn't see Richardson at the club that night.
Sarah Mays and Matthew Richardson testified they saw the appellant and Richardson at Mary's Lounge around 10:30 to 11:00 p.m. (Eastern time) on the night of September 15, 1984.
The appellant testified that he was living with his grandmother on September 15, 1984. At approximately 7:00 p.m. (Central time), he drove to Knott's Grocery and bought two cans of Budweiser beer. The appellant put the beers on the front seat and drove to Richardson's house. When he arrived, around 7:30 or 8:00, Richardson asked the appellant to take him to ML's Club so he could look for his brother. The appellant told Richardson he couldn't take him because he had some business to take care of. Richardson then asked the appellant if he had a gun and the appellant said that he did. The appellant said he had borrowed the gun a week earlier from Dennis for his grandmother's protection.
Richardson then asked the appellant if he could borrow the gun. The appellant told him no and said he had to go. Richardson wanted to go with the appellant and the two drove to the appellant's grandmother's house.
On the way, Richardson kept asking to borrow the gun. He said "Redbone" had threatened him and he needed the gun for protection. The appellant then told Richardson he could borrow the gun but he had to bring it back. He told Richardson to sit in a certain chair at his grandmother's house and he would find the gun in the chair.
Once at Upshaw's house, Richardson sat in the chair while the appellant took a shower.
After this, the appellant and Richardson left Upshaw's house in the appellant's car. Richardson gave the appellant the gun and he put it under the front seat of the car. The appellant and Richardson then went back to Richardson's house. Richardson asked the appellant to take him to ML's Club. When the appellant said he had something else to do, Richardson asked to borrow his car. The appellant agreed and Richardson said he'd be back in 15 minutes.
The appellant went to his car and got one of the Budweiser beers before Richardson left, around 8:30 or 9:00 p.m. (Central time). The appellant remained at Richardson's house until he returned one hour and a half later.
When Richardson returned, he gave the gun to the appellant and told him he'd shot somebody. The gun was loaded when the appellant gave the gun to Richardson. It was empty when he got it back. The appellant wiped the gun with a rag and threw the empty shells away. He then stuck the *1241 gun in a hole in a couch in Richardson's house.
Richardson changed clothes and the two went to Mary's Lounge. They arrived around 10:00 or 10:30 p.m. (Central time). The appellant stayed there until early the next morning.
Later that morning, the appellant went to Matthew Richardson's house and collected a $30 debt from him. Bruce Person was there and told him the victim had been killed. That afternoon, Edmonds took him to Brundidge. He paid Edmonds $20. When the appellant returned from Brundidge a few days later, he was told that Richardson wanted to see him because he was in some kind of trouble. The appellant then went over to Richardson's house to see if he'd gotten rid of the gun. When Richardson said he hadn't, the two returned the gun to Dennis.
The appellant admitted his grandmother sometimes wore a wig. He said that he didn't tell Parker that Richardson told him he'd shot somebody because he didn't think it was important.
During the sentencing phase, Tharon Alford, the appellant's parole officer, testified that the appellant was placed on parole in October of 1982. His parole was revoked because he failed to report, maintain employment and pay fees. On September 15, 1984, the appellant was under a sentence of imprisonment in Alabama.
A stipulation was entered that the appellant was arrested while at work.
Johnny Blue, the appellant's uncle, testified that he and the appellant grew up together. He said that the appellant had a normal childhood although the family was poor. The appellant had married at 18 but his wife died of cancer in 1968. Blue was aware of some of the appellant's previous convictions.
Al Garcia, a certified polygraph examiner, testified that he performed a polygraph examination on the appellant. The appellant exhibited no deceptive responses when he was asked questions about this offense. Garcia admitted there is a lot of controversy about the reliability of polygraph examinations. He said that the results of the appellant's test did not mean that he wasn't necessarily lying.
The jury, by a vote of seven to five, recommended the appellant be sentenced to life imprisonment. A sentencing hearing was held by the trial judge. Following this hearing, the trial judge sentenced the appellant to death.

I
The appellant contends a reversal is mandated in this case because the record does not contain the oath administered to the prospective jurors before their voir dire examination. While there is no statutory or constitutional requirement that an oath be administered to prospective jurors before their voir dire examination, such should be done and has been the practice of the courts in Alabama. See generally 50 C.J.S. Juries § 276. An oath should be administered to prospective jurors prior to voir dire examination so that any answers given by these jurors will be under such oath. State v. Tharp, 42 Wash.2d 494, 256 P.2d 482 (1953); Duffy v. State, 567 S.W.2d 197 (Tex.Crim.App.1978), cert. denied, 439 U.S. 991, 99 S.Ct. 593, 58 L.Ed.2d 666 (1978).
Although we are unable to find an Alabama case which deals with the administration of an oath to prospective jurors before voir dire examination, there are numerous cases concerning the administration of the oath to petit juries as required by § 12-16-170, Code of Alabama 1975.[1] These cases indicate that a presumption cannot be made from a silent record that the jury was sworn. Whitehurst v. State, 51 Ala.App. 613, 288 So.2d 152, cert. denied, 292 Ala. 758, 288 So.2d 160 (1973). There must be some affirmative showing in the record that the oath to the jury was administered. Gardner v. State, 48 Ala. *1242 263 (1872); Lacey v. State, 58 Ala. 385 (1877). A minute entry is deemed to be a sufficient showing that the oath was administered. Whitehurst, supra; Murphy v. State, 403 So.2d 314 (Ala.Crim.App.), cert. denied, 403 So.2d 316 (1981).
There is no reason that the principles set out above should not be applicable to the oath to be administered to the prospective jurors before voir dire examination.
At the beginning of the appellant's trial and prior to the voir dire examination, the following occurred.
"THE COURT: Ladies and gentlemen, the case that has been called for trial is the State of Alabama vs. Robert Lee Tarver, Jr. The indictment charges the defendant with the offense of murder during robbery in the first degree. The alleged victim in this case is Hugh Sims Kite.
"At the table closest to you, to your right front, first is Mr. Richard Hamilton, counsel for the defendant. To his right is the accused, Robert Lee Tarver, Jr. At the end of the table is counsel for the defendant, Mr. Tom Estes.
"At the far table for the prosecution is the district attorney, Mr. Ken Davis. To his right is Captain Thomas Boswell, and at the end of the table is Mr. Mark Carter.

"The oath that you took a few moments ago will still apply to the questions that I have to ask you to specifically and specially qualify you as jurors in this case."
(R. 43-44) (emphasis added).
Thus, the record before us is not silent as to whether an oath was administered to the prospective jurors before their voir dire examination. The record affirmatively shows that an oath was given even though this oath is not set out in the record. Furthermore, the fact that defense counsel made no objection indicates to this court that such an oath was properly administered to the prospective jurors.
The appellant's contention that the jurors were not properly qualified under Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) because the oath was not set out in the record is meritless.
A similar situation to the case at bar was addressed in White v. State, 629 S.W.2d 701 (Tex.Crim.App.1981), cert. denied, 456 U.S. 938, 102 S.Ct. 1995, 72 L.Ed.2d 457 (1982). In White, the record was silent as to whether the prospective jurors had been sworn before voir dire examination except for a remark made by the trial judge to the jurors to "remember that you have been sworn as jurors." White, supra, footnote 2. The appellant in White claimed the jurors were not properly qualified because there was no indication the jurors were under oath when they were asked if the mandatory penalty of death or imprisonment for life would affect their deliberations, as required by a Texas statute. The court in White held that there is a presumption that the jury was properly sworn and therefore properly qualified. See also Duffy, supra, (a capital case where the record was completely silent as to whether the jurors had been sworn prior to voir dire examination).
In the case before us, the record affirmatively shows that the prospective jurors were properly sworn and thus, were properly qualified under Witherspoon, supra. There is no basis of error to reversal here.

II
During the cross-examination of Richardson by defense counsel, Richardson was asked if he was a "peace-loving fellow who wouldn't do anybody any harm." (R. 632). Richardson replied in the affirmative.
Thereafter, defense counsel attempted to question Richardson about a prior altercation between him and a person named "Redbone." Later, defense counsel sought to elicit testimony from Michael "Redbone" Parrish concerning this prior altercation with Richardson. On both occasions, the trial judge refused to allow defense counsel to go into this matter because it constituted impeachment on a collateral matter.
*1243 A witness cannot be impeached by contradiction on an immaterial matter. Williams v. State, 383 So.2d 547 (Ala.Crim. App.1979), affirmed, Ex parte Williams, 383 So.2d 564 (Ala.1980); Frazier v. State, 48 Ala.App. 210, 263 So.2d 511, cert. denied, 288 Ala. 743, 263 So.2d 516 (1972); Malone v. State, 421 So.2d 1357 (Ala.Crim. App.1982); Kilpatrick v. State, 51 Ala. App. 352, 285 So.2d 516, cert. denied, 291 Ala. 628, 285 So.2d 525 (1973); Sheffield v. State, 392 So.2d 1233 (Ala.Crim.App.1980), cert. denied, 392 So.2d 1237 (Ala.1981); Lawrence v. State, 443 So.2d 1351 (Ala. Crim.App.1983), cert. denied, 443 So.2d 1351 (Ala.1984); C. Gamble, McElroy's Alabama Evidence, § 156.01(1) (3rd Ed. 1977).
It makes no difference whether the immaterial testimony is asserted during a witness's direct examination or elicited from him on cross-examination. Kilpatrick, supra. McElroy's, supra. § 156.01(1). It is improper impeachment if, after a party elicits immaterial testimony from a witness, that party seeks to impeach the witness by the witness's own testimony or by calling another witness to impeach the first witness's testimony on the immaterial matter. Malone, supra; Sheffield, supra; McElroy's, supra, § 156.01(5).
Clearly, whether Richardson would ever or had ever hurt anybody is immaterial and has no probative value in the determination of the appellant's guilt or innocence. This is particularly true in light of the fact that the impeaching evidence concerned an altercation between Richardson and a third party.
During the trial, defense counsel stated he was seeking to elicit testimony from Parrish concerning the altercation with Richardson because it "would tend to show the crime [at issue] was committed by someone other than my client." (R. 796).
Generally, a defendant, in disproving his own guilt, may prove that another person committed the crime for which he is being tried. McElroy's, supra, § 48.01(1). However, "evidence of another's guilt is only admissible if such evidence relates to the `res gestae' of the crime for which the accused is being tried" and the evidence "must relate to the perpetration of some deed entering into the crime itself." McElroy's, supra, § 48.01(1). See also Toliver v. State, 142 Ala. 3, 38 So. 801 (1905).
Evidence of the bad character of another person cannot be used for the purpose of showing that this other person, and not the defendant, committed the crime charged. Chesson v. State, 435 So.2d 177 (Ala.Crim.App.1983); McAdams v. State, 378 So.2d 1197 (Ala.Crim.App.1979); McElroy's, supra, § 48.01(10).
The fact that Richardson may have had a prior altercation with Parrish in no way relates to the capital offense for which the appellant was charged. Renfroe v. State, 382 So.2d 627 (Ala.Crim.App.), cert. denied, 382 So.2d 632 (Ala.1980).
Furthermore, "a witness may not be impeached by another's testimony as to specific acts of the witness which have no relevancy except as tending to show the witness's bad character." McElroy's, supra, § 140.01(9). Nor may a witness himself be impeached by "specific acts of misconduct... which have no relevancy except as tending to show that he is a person of bad character as a whole or with respect to truth and veracity." Turner v. State, 380 So.2d 393 (Ala.Crim.App.1980) (quoting McElroy's, supra, § 140.01(10)).
Thus, the trial court's ruling on this issue was correct.

III
At the close of the State's case, defense counsel made a proffer of a Budweiser beer can found in the trash in Richardson's house on December 20, 1984. Initially, the trial judge held that, since the beer can was found more than three months after the commission of the offense, it was too remote to be relevant in this case.
Defense counsel was then given an opportunity to demonstrate the relevancy of the beer can. He stated that two Budweiser *1244 beer cans were purchased by the appellant on the night of this offense. One of the beer cans remained in the appellant's car when Richardson allegedly borrowed the car on the night in question. He maintained that the other beer can was left in Richardson's home by the appellant that night. Defense counsel stated that the beer cans were marked with an identifier which shows the two cans were manufactured on the same date.
The prosecutor then responded that Richardson's home was searched several days after his arrest and this beer can was not in the residence at that time. The beer can was found in Richardson's home after it had been unlocked and open to the public for over two months from the time of Richardson's arrest until the date the can was found. The prosecutor stated that the date on the can did not indicate the date the beer was manufactured but was a coding date which indicates the shelf-life of the beer. Cans with identical markings would be all over the state of Alabama. Further, he stated that the can had been checked for fingerprints and none were found.
The trial judge then examined the two beer cans. On one of the beer cans, the letters "GDR" were found while on the other beer can, the letters were "GBL". Furthermore, the last two digits on one of the cans were "30" and "25" on the other can. The judge then reserved ruling on the State's Motion in Limine to prohibit the introduction of the beer can into evidence. There is no indication in the record that a ruling was ever made on this motion.
The appellant contends on appeal that error occurred because he was not allowed to introduce the beer can into evidence. This contention must fail. First of all, there was no attempt by the appellant to reintroduce the beer can into evidence and the record does not show that the trial court ever granted the State's Motion in Limine. Therefore, there is no adverse ruling as to the admissibility of the beer can on which to base the appellant's contention on appeal.
Secondly, even had there been an adverse ruling, it is clear that the trial judge would have been correct in ruling against the beer can's introduction into evidence. The beer can was not found during the initial search of Richardson's house. It was found two months later after the house had been open to the public for a lengthy period of time. The markings on the two cans were not identical and in no way proved the cans were bought on the same date at the same place. Further, defense counsel admitted the appellant could not testify that the beer can was the one he left at Richardson's house that night. The beer can was completely irrelevant to the case at bar. Thus, no error occurred here.
The appellant further contends that he was somehow prejudiced because he was denied "expert fingerprint assistance" with respect to the beer can, by either the State's experts or a forensic expert. This contention is meritless.
During cross-examination, Gloria Walters, the State's latent print examiner, stated that if the beer can had been submitted to her for examination by the appellant, she would not have examined it because her examinations are at the request of law enforcement agencies. We fail to see how the appellant was prejudiced by Walter's statement that she would not examine the beer can at the request of the appellant. The prosecutor stated that the beer can was checked for fingerprints and none were found.
Prior to trial, defense counsel requested the assistance of a forensic expert. The appellant's Motion for Funds for Experts and Investigators states:
"It is necessary for counsel for Defendant to have experts review the forensic tests made by the State's forensic experts. The counsel for defendant do not have the expertise necessary to properly evaluate the results of the forensic tests which have been run at the request of the State, and the assistance of experts in determining the validity of these results, and identifying areas which need *1245 to be covered on cross examination, is essential." (R. 1116)
The trial court then entered an order which approved $1,000 for a criminal investigator and denied expenses for a "juristic psychologist." He reserved "ruling on the approval of expenses for a forensic expert until defendant can show the type of forensic experts required, the need for such experts, and an estimated fee for each forensic expert." (R. 1118)
The initial request for the approval of expenses for a forensic expert was "little more than undeveloped assertions that the requested assistance would be beneficial." Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 2637, n. 1, 86 L.Ed.2d 231 (1985). The record does not reveal that the appellant made any further showing of the need for a forensic expert in regard to the beer can or otherwise. Thus, the appellant was not unconstitutionally denied the assistance of experts. Hold v. State, 485 So.2d 801 (Ala.Crim.App.1986). The appellant's rights to due process of law were not violated in this instance. See Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); Ex parte Grayson, 479 So.2d 76 (Ala.1985); Duren v. State, [Ms. 6 Div. 619, February 25, 1986] (Ala. Crim.App.1986).

IV
The following remark was made during the prosecutor's closing argument to the jury: "What interest in the world possibly, logically does Andrew Richardson have in turning himself in and exposing himself to the electric chair? That is absolutely beyond comprehension." (R. 939).
The appellant asserts this remark by the prosecutor was improper and thus, this case should be reversed. We disagree.
"Counsel for both the defendant and the State are allowed wide latitude on drawing reasonable inferences from the evidence in their closing arguments. Both have the right to present their impressions from the evidence, if reasonable, and argue every legitimate inference. Manigan v. State, 402 So.2d 1063 (Ala.Cr.App.), cert. denied, 402 So.2d 1072 (Ala.1981). Statements of counsel in argument to the jury must be viewed as in the heat of debate, and such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Hayes v. State, 395 So.2d 127 (Ala.Cr.App.1980), cert. denied, 395 So.2d 150 (Ala.1981).
"To constitute reversible error, the statement of counsel in argument must be made as a fact which is unsupported by any evidence, and the argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury. Manigan, supra."
Sanders v. State, 426 So.2d 497, 509 (Ala. Crim.App.1982), cert. denied 426 So.2d 497 (Ala.1983).
There was evidence presented at trial that Richardson willingly accompanied Parker to the Sheriff's Office and agreed to talk with him about this case prior to his arrest for this offense. Numerous references were made, including those by defense counsel, that Richardson has also been indicted for this offense.
Thus, the prosecutor was merely arguing legitimate inferences from the evidence when he made the above-quoted remark. Such is not improper and thus, no error appears here. Mathis v. State, 414 So.2d 151 (Ala.Crim.App.1982).

V
Prior to trial, defense counsel filed a Motion in Limine requesting the trial judge to prohibit the admission into evidence of a journal entry from the Court of Common Pleas in Summit County, Ohio. Although the trial court did not specifically grant the motion, he stated "[i]t would appear that the Motion in Limine at this point would be well taken, and before we get into the contents or its admissibility as an exhibit, the State should take up the matter outside the presence of the jury." (R. 27).
*1246 On direct examination, the appellant admitted two convictions for receiving stolen property, one in Barbour County and one in Pike County. On cross-examination of the appellant, the following occurred:
"Q. Have you ever been convicted of anything else?
"MR. ESTES: Your Honor, I object to that question. Mr. Davis understands that is not a proper question.
"THE COURT: Objection is sustained.
"MR. DAVIS: Judge, may we approach the bench?
"THE COURT: Yes.
"MR. ESTES: Your Honor, I ask for a mistrial at this time, move for a mistrial. (A brief conference was held at the bench between the Court, Mr. Davis, Mr. Carter, Mr. Estes, and Mr. Hamilton outside the hearing of the reporter and the jury.)
"THE COURT: Objection is sustained. The motion made by defense counsel is denied." (R. 847)
The appellant contends that the prosecutor's question about additional convictions was in violation of the Motion in Limine. He asserts the trial judge erred by failing to give curative instructions. Further, he states that even had curative instructions been given, his motion for a mistrial should have been granted because the question was so prejudicial that it could not be eradicated from the jury's mind. The appellant's assertions are without merit.
First of all, the prosecutor's question did not violate the Motion in Limine. By his question, the prosecutor was not seeking to admit into evidence the journal entry from Ohio. He was merely asking the appellant if he had any other convictions.
Secondly, the objection to the question was immediately sustained and the question was not answered. Improper questions which are not answered are harmless. Ward v. State, 356 So.2d 238 (Ala.Crim.App.1978). Parker v. State, 406 So.2d 1036 (Ala.Crim.App.), 406 So.2d 1041 (Ala.1981).
Thirdly, a motion for a mistrial is addressed to the sound discretion of the trial court. Wallace v. State, 455 So.2d 177 (Ala.Crim.App.1984); McMurphy v. State, 455 So.2d 924 (Ala.Crim.App.1984).
"A high degree of `manifest necessity' for the granting of a mistrial must be demonstrated before a mistrial should be granted. Woods v. State, 367 So.2d 982 (Ala.1978); Alabama Code Section 12-16-233 (1975). `A trial judge is allowed the exercise of broad discretion in deciding whether that high degree of necessity is present.' Woods, 367 So.2d at 984. An appellate court `will not interfere with the exercise of that discretion unless there is clear abuse of it.' Woods, supra. This is because the trial judge `heard what transpired and has seen the scenario unfold. He is in a far better position to determine whether a jury should be discharged and a mistrial granted.' Duncan v. City of Birmingham, 384 So.2d 1232, 1240 (Ala.Cr.App.1980).
"Whether an improper question, answer or remark is so prejudicial as to require a mistrial depends upon the issues, parties, and general circumstances of the particular case. Williams v. State, 245 Ala. 32, 36, 15 So.2d 572 (1944). `The entry of a mistrial is not lightly to be undertaken ... (T)he entry should be only a last resort, as in cases of otherwise ineradicable prejudice.' Thomas v. Ware, 44 Ala.App. 157, 161, 204 So.2d 501 (1967) (emphasis in original). A mistrial indicates more than a `mere erroneous ruling of law' and signifies such fundamental errors in a trial as to vitiate the result. Thomas, supra."
Wadsworth v. State, 439 So.2d 790, 792 (Ala.Crim.App.), cert. denied, 439 So.2d 790 (Ala.1983).
Here, the possible prejudicial effect of the prosecutor's question could have been eradicated by curative instructions. The question was not of the type that any impermissible inferences could not have been eliminated from the jury's mind. However, no request for curative instructions was made by the appellant. Retowsky *1247 v. State, 333 So.2d 193 (Ala.Crim.App. 1976); Shadle v. State, 280 Ala. 379, 194 So.2d 538 (1967).
Furthermore, the prejudicial effect of the prosecutor's question was slight, if any. The appellant had already admitted to having two convictions.
Thus, the trial judge correctly denied the appellant's motion for a mistrial. Shadle, supra.

VI
The appellant challenges the sufficiency of the evidence on two grounds. First, he asserts that Richardson's testimony was not sufficiently corroborated.
"The test for determining whether there is sufficient corroboration of the testimony of an accomplice consists of eliminating the testimony given by the accomplice and examining the remaining evidence to determine if there is sufficient incriminating evidence tending to connect the defendant with the commission of the offense. Miller v. State, 290 Ala. 248, 275 So.2d 675 (1973)."
"The corroboration of an accomplice must tend to connect the accused with the commission of the crime but need not refer to any statement or fact testified to by the accomplice. `Corroborate means to strengthen, to make stronger, to strengthen, not the proof of any particular fact to which the witness has testified, but to strengthen the probative, criminating force of his testimony.' Malachi v. State, 89 Ala. 134, 140-141, 8 So. 104, 106 (1889); Smith v. State, 230 Ala. 413, 416, 161 So. 538 (1935); Brown v. State, 31 Ala.App. 529, 19 So.2d 88 (1944). The corroborative evidence need not be strong, nor sufficient of itself to support a conviction, the criterion being that it legitimately tend to connect the accused with the offense. Miller v. State, 290 Ala. 248, 275 So.2d 675 (1973). Corroborative evidence need not directly confirm any particular fact nor go to every material fact stated by the accomplice. Bridges v. State, 52 Ala.App. 546, 295 So.2d 266 (1974); Dykes v. State, 30 Ala.App. 129, 1 So.2d 754 (1941). Corroborative evidence need not directly connect the accused with the offense but need only tend to do so. State v. Canada, 107 Ariz. 66, 481 P.2d 859, cert. denied, 404 U.S. 848, 92 S.Ct. 154, 30 L.Ed.2d 87 (1971). See Pearce v. State, 26 Ala.App. 492, 495, 164 So. 114, cert. denied, 231 Ala. 150, 164 So. 118 (1935) (`(B)ut, as we read the cases, the corroboratory evidence, if it meets the test of "tending to connect the defendant with the commission of the offense", need not be, in and of itself alone, that tending in any wise to fasten guilt upon the defendant'); 23 C.J.S. Criminal Law § 812(3) (1961). The sufficiency of corroborating evidence is established if its probative value tends to connect the defendant with the commission of the crime. Lowe v. State, 32 Ala.App. 176, 22 So.2d 618 (1945). The corroboration of an accomplice may be shown by circumstantial evidence. Blevins v. State, 56 Ala.App. 115, 319 So.2d 734, cert. denied, 294 Ala. 753, 319 So.2d 739 (1975); Tidwell v. State, 23 Ala.App. 409, 126 So. 186 (1930)."
Andrews v. State, 370 So.2d 320, 321-22, (Ala.Crim.App.), cert. denied, 370 So.2d 323 (Ala.1979). See, Cumbo v. State, 368 So.2d 871 (Ala.Crim.App.1978) cert. denied 368 So.2d 877 (Ala.1979).
A review of the evidence reveals that there was sufficient evidence presented by the State, tending to connect the appellant to this offense even when Richardson's testimony is eliminated from consideration.
The victim died as a result of a gunshot wound to the chest. Ballistics tests revealed that the bullet that killed the victim was fired through a gun owned by Esther Dennis. Dennis loaned this gun to the appellant one Saturday afternoon and the appellant returned the gun to her over a week later. She never lent the gun to anyone else.
No wallet was found on the victim's body. The left rear pocket of the victim's pants was turned inside out when the body was found. This was the pocket in which *1248 the victim habitually kept his wallet. The victim's son saw his father with his wallet just hours before his death. The victim kept large bills in his wallet and also any money for special purposes. The victim told his son on the night of his death that he thought he had enough money to meet a $3,000 obligation. The victim offered to give his son some money from his wallet on the evening of his death.
The appellant told investigators he was out of work one month prior to the victim's death. Even so, he gave Bossie Edmonds a $20 bill the day after the victim was killed. At this time, Edmonds also saw the appellant with more money in his possession.
Distinctive shoe prints were found leading from a pasture behind Kite's Store to the murder scene. The shoe prints also led away from the scene back to the pasture where a distinctive set of tire tracks was found. Sheriff Griffith testified that the characteristics of the tires on the appellant's vehicle matched those of the tire tracks found in the pasture. Tellis Hudson stated that one of the tire tracks in the pasture could have been made by one of the tires on the appellant's car. The tire tracks indicated the car left the area at a high rate of speed. A fresh Budweiser beer can was found in the pasture near the tire tracks. The appellant's right thumb print was found on this can. The appellant told investigators he drank Budweiser beer.
A Salem cigarette butt with its ash in good condition was also found near the tire tracks. The appellant was noted smoking Salem cigarettes during an interview.
The appellant told investigators that he was with Richardson playing pool at Mary's Lounge from 7:00 p.m. until 3:00 a.m. on the night of the victim's death. Robert Hardaway testified that he arrived at Mary's Lounge at 6:00 on the evening of September 15, 1984. He did not see the appellant and Richardson there until 11:30 or 12:00 that night. No one played pool at Mary's Lounge after the music started playing around 8:00.
The appellant told the investigators that Bruce Person told him that the victim had been killed the day after the murder. Immediately after that, the appellant went to Brundidge.
These facts logically and reasonably tend to connect the appellant to the offense at bar. Thus, we find Richardson's testimony was sufficiently corroborated by other evidence.
Secondly, the appellant contends the State failed to show that a robbery was committed because there was no proof that anything was taken from the victim.
The victim's son testified that his father had a habit of keeping money in his wallet which he kept in his left rear pocket. He saw his father with this wallet on the night of his death and his father had offered to give him some money. The victim's wallet was not found. The pocket in which the victim kept his wallet was found empty and turned inside out.
Richardson testified that the appellant told him he had killed the victim. When the two returned to Richardson's house after leaving the pasture behind Kite's Store, the appellant counted some money and gave Richardson $80. The next day, the appellant gave Bossie Edmonds $20 from some folded money in his hand.
"Circumstantial evidence may afford satisfactory proof of the corpus delecti in a murder and/or robbery prosecution, and if facts are presented from which the jury may reasonably infer that the crime has been committed, the question must be submitted to the jury. Dolvin v. State, Ala., 391 So.2d 133 (1980); Griffin v. State, Ala. Cr.App., 393 So.2d 523 (1981); Hopson [v. State, Ala.Cr.App., 352 So.2d 500 (1976)], supra." McCloud v. State, 401 So.2d 314 (Ala.Crim.App.1981).
The facts recited above would allow the jury to reasonably infer that the victim's wallet was taken from the victim on the night of his death.
Furthermore, our present robbery statutes do not require an actual taking of property. The statutes now include an attempted *1249 theft. Grace v. State, 431 So.2d 1331 (Ala.Crim.App.1982); cert. quashed, 431 So.2d 1331 (Ala.1983).
Not only do the circumstances of this case point to an actual theft, but there is also evidence of an attempted theft. Money was found on the ground outside the victim's left front pocket. Two credit cards were found lying next to the victim's leg. From these facts, the jury could infer an attempted theft of the victim had been committed.
"In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. United States v. Black, 497 F.2d 1039 (5th Cir.1974); United States v. McGlamory, 441 F.2d 130 (5th Cir.1971); Clark v. United States, 293 F.2d 445 (5th Cir.1961).
"`(W)e must keep in mind that the test to be applied is not simply whether in the opinion of the trial judge or the appellate court the evidence fails to exclude every reasonable hypothesis but that of guilt; but rather whether the jury might so conclude. Harper v. United States, 405 F.2d 185 (5th Cir.1969); Roberts v. United States, 416 F.2d 1216 (5th Cir.1969). The procedure for appellate review of the sufficiency of the evidence has been aptly set out in Odom v. United States, 377 F.2d 853, 855 (5th Cir.1967):
"`Our obligation, therefore, is to examine the record to determine whether there is any theory of the evidence from which the jury might have excluded every hypothesis except guilty beyond a reasonable doubt. Rua v. United States, 5 Cir., 1963, 321 F.2d 140; Riggs v. United States, 5 Cir., 1960, 280 F.2d 949. In Judge Thornberry's words,
"`* * * the standard utilized by this Court is not whether in our opinion the evidence and all reasonable inferences therefrom failed to exclude every hypothesis other than guilt, but rather whether there was evidence from which the jury might reasonably so conclude.' Williamson v. United States, 5th Cir., 1966, 365 F.2d 12, 14. (Emphasis supplied)
"`The sanctity of the jury function demands that this court never substitute its decision for that of the jury. Our obligation is to examine the welter of evidence to determine if there exists any reasonable theory from which the jury might have concluded that the defendant was guilty of the crime charged.' McGlamory, 441 F.2d at 135 and 136.
"See also Blair v. State, 18 Ala.App. 615, 93 So. 45 (1922). Whether circumstantial evidence tending to connect the defendant with the crime excludes, to a moral certainty, every other reasonable hypothesis than that of the defendant's guilt is a question for the jury and not the court. Cannon v. State, 17 Ala.App. 82, 81 So. 860 (1919); see also Evans v. State, 39 Ala.App. 404, 408, 103 So.2d 40, cert. denied, 267 Ala. 695, 103 So.2d 44 (1958)."
Cumbo v. State, 368 So.2d 871 (Ala.Crim. App.1978), cert. denied, 368 So.2d 877 (Ala. 1979).
The facts of this case have been thoroughly recited in this opinion and it is unnecessary to restate them at this point. However, it is clear from a review of the evidence in this case that the State presented sufficient evidence from which the jury could conclude, by fair inference, that the appellant was guilty of the offense charged beyond a reasonable doubt. The issue of the appellant's guilt was a question for the jury which they properly resolved.
Thus, the appellant's motion for judgment of acquittal was correctly denied.

VII
In its brief, the State asserts that the trial court incorrectly allowed testimony regarding *1250 the results of a polygraph examination of the appellant to be considered by the jury in the sentencing phase and found these results to be mitigating circumstances.
This court has held that the results of polygraph examinations are not admissible during a criminal trial except by stipulation of the parties. Wynn v. State, 423 So.2d 294 (Ala.Crim.App.), cert. denied 423 So.2d 294 (Ala.1982). We need not decide whether this evidence is admissible during the sentencing phase of a capital case or whether this evidence may properly be considered as a mitigating circumstance in a capital case since these questions are not properly before this court.
The State has no right to appeal in a criminal case except upon statutory authority. State v. Gautney, 344 So.2d 232 (Ala.Crim.App.1977). See State v. Elkerson, 285 S.E.2d 784 (N.C.1982) (a capital case in which the State had no authority to appeal the trial court's refusal to submit to the jury two aggravating circumstances).
The State is allowed to appeal in habeas corpus cases (§ 12-22-90, Code of Alabama 1975), when the statute under which the prosecution preferred is held to be unconstitutional (§ 12-22-91, Code of Alabama 1975) and from certain pre-trial orders of the trial judge in a felony case (Rule 17, Alabama Temporary Rules of Criminal Procedure). None of these situations is applicable in this case.
The State could have filed a cross-appeal under Rule 28(h), A.R.A.P. but chose not to do so. Thus, the alleged errors raised by the State in its brief are not preserved for our review. State v. Green, 55 Ohio App. 239, 9 N.E.2d 625 (1936).
Furthermore, the State was not prejudiced by these alleged errors. The trial judge found the aggravating circumstances outweighed the mitigating circumstances and imposed the death penalty in spite of his consideration of the results of the polygraph examination as a mitigating circumstance.

VIII
The appellant contends the trial judge erred by finding as an aggravating circumstance the fact that the capital offense was committed while the appellant was engaged in the commission of a robbery (which is an aggravating circumstance under § 13A-5-49(4), Code of Alabama 1975), because robbery was an element of the capital offense charged in the indictment. See § 13A-5-40(a)(2), Code of Alabama 1975. This argument must fail.
"`The fact that a particular capital offense as defined in section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.' § 13A-5-50. Ex parte Kennedy, 472 So.2d 1106, 1108 (Ala.1985); Colley v. State, 436 So.2d 11,12 (Ala.Cr.App.1983); Dobard v. State, 435 So.2d 1338, 1344 (Ala.Cr.App.1982), affirmed, 435 So.2d 1351 (Ala.1983), cert. denied, [464] U.S. [1063], 104 S.Ct. 745, 79 L.Ed.2d 203 (1984); Heath v. State, 455 So.2d 898, 900 (Ala.Cr.App.1983), affirmed, 455 So.2d 905 (Ala.1984), cert. granted in part, [470] U.S. [1026], 105 S.Ct. 1390, 84 L.Ed.2d 780 (1985); Jackson v. State, 459 So.2d 963, 966 (Ala.Cr.App.), affirmed, 459 So.2d 969 (Ala.1984), cert. denied [470] U.S. [1034], 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985); Julius v. State, 455 So.2d 975, 981-82 (Ala.Cr.App.1983), affirmed, 455 So.2d 984, 987 (Ala.1984), cert. denied, [469] U.S. [1132], 105 S.Ct. 817, 83 L.Ed.2d 809 (1985); Ex parte Kyzer, 399 So.2d 330, 337-38 (Ala.1981)."
Bradley v. State, 494 So.2d 750 (Ala.Crim. App.1985).

IX
The appellant further contends that the trial judge erred by finding as an aggravating circumstance the fact that the capital offense was committed while he was under sentence of imprisonment (which is an aggravating circumstance under *1251 § 13A-5-49(1), Code of Alabama 1975) because he was on parole at the time this offense was committed. This contention, too, must fail.
The definition of the term "under sentence of imprisonment" states that "[A]s used in section 13A-5-49(1), the term means while serving a term of imprisonment, while under a suspended sentence, while on probation or parole, or while on work release, furlough, escape, or any other type of release or freedom while or after serving a term of imprisonment, other than unconditional release and freedom after expiration of the term of sentence." Ala. Code, § 13A-5-39(7) (1975). (emphasis added).

X
A trial judge is authorized to reject a jury's recommendation of life without parole when imposing sentence. Lindsey v. State, 456 So.2d 383 (Ala.Crim.App. 1983), affirmed, Ex parte Lindsey, 456 So.2d 393 (Ala.1984); Ex parte Jones, 456 So.2d 380 (Ala.1984); Murray v. State, 455 So.2d 53 (Ala.Crim.App.1983), reversed on other grounds, Ex parte Murray, 455 So.2d 72 (Ala.1984).

XI
This court has reviewed the propriety of the death sentence in this case as required by § 13A-5-53, Code of Alabama 1975.
A review of the record reveals no error which has adversely affected the substantial rights of this appellant. A.R.A.P., Rule 45A.
In its written findings of fact (See Appendix A hereto attached), the trial court found the existence of two aggravating circumstances ("the capital offense was committed while the defendant was engaged in the commission of a robbery" and "the capital offense was committed by a person under sentence of imprisonment") and one mitigating circumstance ("the defendant exhibited no signs of deception in a polygraph examination in which he denied committing the crime or being present when it was committed"). The trial court also considered the mitigating circumstances enumerated in § 13A-5-51, Code of Alabama 1975 and found none to exist.
The appellant contends the trial judge should have found as mitigating circumstances the evidence that the appellant had an "unpleasant former marriage and a somewhat deprived childhood." (Appellant's brief, p. 56). The record reveals that the trial judge considered these "other mitigating circumstances offered pursuant to Section 13A-5-52 Code of Alabama 1975" and found none existed. We agree with the trial judge that a marriage which ended 16 years before the commission of this offense and a poor childhood (the appellant was 36 years old when the crime was committed) are not mitigating circumstances. The trial court's findings concerning the aggravating and mitigating circumstances are fully supported by the evidence in this cause.
The jury recommended the appellant be sentenced to life without parole. The trial judge found that, even when the jury's recommendation was taken into consideration, the aggravating circumstances outweighed the mitigating circumstances. Our independent review of the aggravating and mitigating circumstances in this case leads us to the conclusion that the trial judge's sentence of death was appropriate in this case.
There is no evidence in the record that the death sentence was imposed under the influence of passion, prejudice or any other arbitrary factor.
Finally, considering both the nature of the crime and this appellant, we do not find that the death penalty is excessive or disproportionate to the penalty imposed in other cases. Wright v. State, 494 So.2d 726 (Ala.Crim.App.1985); Jones v. State, 456 So.2d 366 (Ala.Crim.App.1983), affirmed, Ex parte Jones, 456 So.2d 380 (Ala.1984); Luke v. State, 444 So.2d 393 (Ala.Crim. App.), affirmed, Ex parte Luke, 444 So.2d 400 (Ala.1983), cert. denied 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984). *1252 Thompson v. State, [Ms. 6 Div. 799, April 8, 1986] ___ So.2d ___ (Ala.Crim.App. 1986).
The appellant's conviction of this capital offense and his sentence of death are due to be, and the same are hereby, affirmed.
AFFIRMED.
PATTERSON and TAYLOR, JJ., concur.
BOWEN, P.J., concurs specially with opinion, in which McMILLAN, J., concurs.

APPENDIX

JUDGMENT AND ORDER
The defendant, with assistance of counsel at all proceedings, was found guilty of murder during robbery in the first degree as charged in the indictment. Pursuant to Section 13A-5-47, Code of Alabama 1975, the Court makes the following findings of fact summarizing the crime in this case and the defendant's participation in the crime:

FINDINGS OF FACT FROM GUILT PHASE OF THE TRIAL
On September 15, 1984, Hugh Sims Kite owned and operated a grocery store on State Highway 165 in Cottonton, Alabama. Cottonton is an unincorporated community located in southern, rural Russell County, Alabama. On the night of September 15, 1984, Kite was at the store with Jerry Ford, a 10-year-old boy who was employed on a part-time basis at the store. When Mr. Kite was ready to close the store, Jerry Ford was told by him to wait in front of the store. After going out the front door, Mr. Kite went toward the rear of the store. Jerry Ford heard what he believed to be two shots. He called for Mr. Kite but received no answer; he did not go to the side or rear of the store.
Benny Davis arrived at the store a short time later and saw Jerry Ford standing in front of the store. Upon learning about the shots, he got a flashlight and went around the corner of the store. There he discovered Mr. Kite's body on the ground beside a truck which was parked between the store and another building. Davis called the Russell County Sheriff's Department.
Deputy Sollie Pate responded to the call and arrived on the scene at approximately 10:30 P.M. Between the buildings he found Mr. Kite's truck and a van.
Coroner Leslie Vance pronounced Mr. Kite dead at the scene at 11:30 P.M. He found three gunshot wounds to the body. Cause of death was determined to be a gunshot wound to the chest. Mr. Kite had also been shot twice in the right thigh. Deputy Herbert Parker and he made an inventory of the items on the body. $89.96 was found in the left front pants pocket area. Two credit cards were found beside the left leg. $65.35 was found in the right front pants pocket. In the afternoon of September 15, 1984, Mr. Kite had a sum of money in his wallet. He habitually carried the wallet in his left hip pants pocket. The wallet was not found on the body, and it has never been recovered. United States currency was lying on the ground beside the body. It and the credit cards were left there after being taken from Mr. Kite's body.
Sheriff Prentiss Griffith and Deputy Ray Smith search the area and found shoe prints of a distinctive pattern which led from the crime scene toward Highway 165. The prints were also found on a dirt road which intersected with Highway 165 approximately one-quarter mile south of Kite's store. Tire prints were found on the dirt road; these prints led to the discovery of a place where the car making the tire prints had parked. Beside this place a cigarette butt and a Budweiser beer can were found. Defendant's right thumb print was identified as being on the beer can.
The dirt road leads to a camping area through a large field. On the night of September 15, 1984, Sue Howard was camping in this area. At approximately 9:15 P.M. she saw lights from a car 300 yards away in the field. Sometime between *1253 10:00 and 10:30 P.M., she heard four gunshots.
The murder weapon was determined to be a pistol owned by Esther Dennis. She had known defendant for 1½ years. She had never loaned this pistol to anyone else but she allowed defendant to borrow it on a Saturday. She testified that defendant returned it a little over a week after she loaned it to him. Andrew Richardson was also indicted for the crime. He testified on behalf of the State. He had known defendant for four years before Mr. Kite was killed. On September 15, 1984, he saw defendant late in the evening when defendant came to his (Richardson's) house. Defendant was driving his car, a gray Chevrolet. Richardson had been drinking beer and whiskey that day.
Upon arriving, defendant asked if Richardson wanted to go for a ride; Richardson agreed to go with defendant. Defendant had with him a pair of coveralls, a stocking cap, and a wig. In the house, defendant put them on and asked Richardson if he thought the disguise would fool anybody. Defendant said that he "had to tend to some business with a white man." They left Richardson's house in defendant's car and went toward Kite's store. Defendant first drove past the store; he turned around and went to M.L.'s Place, which is a night club near Kite's store. There Richardson looked for his brother-in-law. Not finding him, they returned to Highway 165 and turned onto the dirt road leading to the camping area. Defendant backed the vehicle and turned it so that it was headed toward Highway 165. Richardson and defendant sat there and talked for a while. Defendant drank a Budweiser beer during this time. Defendant stated that he "hated to do it, but he had to go up there." Defendant instructed Richardson to drive the automobile back to his (defendant's) house if he didn't come back. Defendant was wearing the coveralls and he put the wig and cap on before leaving the car. Upon completing his disguise, he walked toward the store.
Some minutes later, Richardson heard what he believed to be three shots. After that defendant appeared at the car; he was wearing the coveralls but not the wig or cap. Defendant got into the passenger's seat and told Richardson to drive the vehicle. Richardson drove away and while they were riding in the automobile, defendant said he had messed uphe had killed Mr. Kite. Before arriving at Richardson's house, they stopped on a dirt road where defendant went into the woods and left the coveralls, wig and cap. At Richardson's house, defendant counted some money and he gave Richardson $80.00. Defendant hid a pistol under a couch in the house. They then left the house and went to a night club in northern Barbour County, Alabama. They spent the night with friends who lived in that vicinity.
The next day, September 16, defendant asked an acquaintance named Bossie Lee Edmond to drive him to his mother's home in Brundidge, Alabama. Richardson also rode with them. In Brundidge, defendant took a twenty-dollar bill from a fold of bills and paid Edmond for the trip.
Defendant returned to Russell County on September 20, 1984. He retrieved the gun from Richardson's house and took it to Esther Dennis that same day.
Defendant was later arrested for a violation of parole. Subsequently, Richardson told a friend about the events which occurred on September 15,1984. The Russell County Sheriff's office was then contacted, and the investigation of the crime narrowed to Richardson and defendant. The murder weapon was recovered from Esther Dennis, and defendant's car was also taken as evidence. A tire on defendant's automobile was identified as making one of the prints on the dirt road leading to the camping area.
The Court finds that Richardson's statements against the defendant have surpassed the requirements of the laws of this state requiring sufficient evidence to corroborate the testimony of an accomplice.
Hugh Sims Kite was murdered during a robbery in which money was taken from *1254 his person. There is no evidence to suggest that at any time he was armed with a weapon. There is no evidence to indicate that the killing of Hugh Sims Kite was a justifiable or excusable homicide.
The Court finds that the defendant murdered Hugh Sims Kite during a robbery in the first degree. The Court finds that the defendant did intentionally cause the death of Hugh Sims Kite by shooting him with a pistol and that defendant caused this death while in the course of committing a theft of property of Hugh Sims Kite by the use of force against his (Kite's) person, with intent to overcome his physical resistance or physical power of resistance while the defendant was armed with a pistol.

FINDINGS FROM SENTENCING PHASE
After the trial a sentence hearing was conducted with participation by the jury. The State rested upon the evidence brought forth at the trial. The defendant presented evidence by witnesses called to testify. Arguments were made to the jury by both sides. The jury deliberated after being charged by the Court and returned its recommendation that the defendant be punished by life imprisonment without parole. Seven of the jurors voted for that sentence, and five jurors voted for death.
The Court ordered the Probation Officer for this Circuit to prepare a written pre-sentence investigation report. This report was duly prepared and filed. Copies of the same were furnished to counsel for both parties. A hearing was held for the parties to respond to the report and to present evidence about any part of the report which would be the subject of a factual dispute. Arguments were also made regarding the sentence that should be imposed in this case.
The Court finds from the evidence presented in the guilt phase of this trial that the defendant was guilty and is guilty of the murder of Hugh Sims Kite during a robbery in the first degree of the said Hugh Sims Kite.
The Court finds the following aggravating circumstances to exist in this case:
1. The capital offense was committed while the defendant was engaged in the commission of a robbery.
2. The capital offense was committed by a person under sentence of imprisonment. At the time that the capital offense was committed, the defendant was released on supervised parole from a conviction imposed in a circuit court of the State of Alabama.
The Court finds that the following aggravating circumstances do not exist in this case:
A. The defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to the person.
B. The defendant knowingly created a great risk to many persons.
C. The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
D. The capital offense was committed for pecuniary gain.
E. The capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.
F. The capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit rape, burglary, or kidnapping.
G. The capital offense was especially heinous, atrocious or cruel compared to other capital offenses as those terms have been defined by the appellate courts.
Upon consideration of all the evidence brought forth at the trial of this case, the sentence hearings, and the pre-sentence investigation report, the Court finds that the following mitigating circumstance exists:
The defendant exhibited no signs of deception in a polygraph examination in *1255 which he denied committing the crime or being present when it was committed.
The Court finds that the following mitigating circumstances do not exist in this case:
A. The defendant has no significant history of prior criminal activity. The Court finds that the defendant does have a significant history of prior criminal activity in that before the crime in the instant case was committed, he had been convicted of three felonies: possession of a narcotic drug, receiving stolen property in the first degree, and theft of property in the first degree.
B. The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.
C. The victim was a participant in the defendant's conduct or consented to it.
D. The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor.
E. The defendant acted under extreme duress or under the substantial domination of another person.
F. The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
G. The age of the defendant at the time of the crime. At the time of the crime the defendant was 36 years old.
H. Any other mitigating circumstances offered pursuant to Section 13A-5-52 Code of Alabama 1975.
In determining the sentence, the Court has not been influenced by any references or expressions of community sentiment that have been made.
Upon considering and weighing the aggravating circumstances against the mitigating circumstances, the Court finds that the aggravating circumstances outweigh any mitigating circumstances. In making this determination the Court has considered the jury recommendation of life without parole. The Court finds that the aggravating circumstances outweigh any mitigating circumstances when the jury recommendation of life without parole is also taken into consideration. It is, therefore,
ORDERED and ADJUDGED by the Court that the defendant be sentenced to death by electrocution, as set forth in an order of sentence by this Court and as specified to be carried out by the laws of this State.
DONE this the 8th day of March, 1985.
 /s/ Wayne T. Johnson
 CIRCUIT JUDGE,
 RUSSELL COUNTY, ALABAMA
BOWEN, Presiding Judge, concurring specially.
I concur with the majority opinion as to every issue except Issue VII. This Court should not decide whether or not the trial judge erred in allowing the jury to consider, in determining punishment, evidence of a polygraph examination taken by the defendant. Any determination of that issue would be mere dicta because the question is presented by the State and that determination is not necessary to the result reached by this Court in affirming the conviction and sentence.
The State's ability to appeal is immaterial in this case. If the alleged error "has or probably has adversely affected the substantial right of the appellant," this Court has a duty to address it under Rule 45A, A.R.A.P. Under Alabama Code 1975, § 13A-5-53(a), this Court has a statutorily imposed duty to determine "whether any error adversely affecting the rights of the defendant was made in the sentence proceedings," and "whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence."
Contrary to the majority opinion, the State could not have filed a "cross-appeal under Rule 28(h), A.R.A.P." The right to appeal exists only by statute and I have found no statute authorizing the State to file a cross appeal. Rule 28(h) only involves "briefs in cases involving cross appeals" *1256 and does not authorize the filing of any appeal by anyone. The State's right of appeal is limited by statute (§§ 12-12-70(b), 12-22-90 and -91) and by the rules of criminal procedure (A.R.Cr.P.Temp., Rule 17). The right to appeal cannot and should not be expanded by judicial decree, much less by dicta in a judicial opinion. I find no place for Issue VII in this opinion and would omit it therefrom.
NOTES
[1] The appellant concedes and the record shows that the jurors selected to sit for this case were properly administered the oath set out in § 12-16-170, Code of Alabama.