Kennie Dale Garrison was convicted of murder and was sentenced to life imprisonment in the penitentiary. He was initially indicted for murder during the course of a first degree robbery and for murder during the course of a second degree burglary.
The accused and two other men planned to break into the lot of Cavalier Homes, a mobile home manufacturer. Their object was to steal refrigerators and microwave ovens, which they would "fence" for cash. They waited until dark and entered the premises. They armed themselves with a 2 X 4 piece of lumber and a roll of duct tape, intending to deal with any security guard they encountered by striking him with the 2 X 4 and taping him up. One of the burglars, Randy Self, testified that he heard what sounded like a blow and went back to where they had seen a guard apparently asleep. Indeed, someone had struck a security guard. They then taped the man's ankles and knees and proceeded about their intended theft. They put 6 refrigerators and 16 microwave ovens on a truck. Self testified that while they were loading the merchandise on the truck, appellant Garrison went back inside the building for about five minutes. They left with the goods. They were paid $2,400 for this merchandise. They divided the money, with appellant Garrison and his brother Nathaniel (Nathan) Garrison, getting $1,000 each, and Self getting $400.
The refrigerators and microwave ovens were found and recovered from a barn where they had been unloaded from the trucks after being purchased by J.W. Tubbs. The truck was recovered the next day in another county. There was testimony that this crime had been planned several days earlier and that there was a discussion about whether to hit the guard in the head or in the stomach. When found, the security guard was in the restroom on the floor, kneeling over the commode. He had a pocketknife in his right hand and it appeared that he was trying to cut the tape on his wrists at the time he died from the injuries to his head. The victim's wallet was not on his person when his body was found. It was later recovered on a highway some distance away.
Jeff Anderson, a cellmate of the accused, testified that the accused told him that the other two men involved in the burglary did not kill the old man. The victim in this case was the night watchman, Mr. Willie Floyd Bartlett. It was testified that his death was caused by a blunt force injury to the head, including the bruising of the brain. This injury was consistent with being hit on the head with a piece of lumber.
 I
In the first issue raised in this appeal the appellant contends that the trial court abused its discretion in denying his motion for a private psychiatric examination. On April 9, 1985, the appellant filed a petition for psychiatric examination. On May 14, the trial court ordered that the appellant be removed to the Taylor Hardin Secure Medical Facility in Tuscaloosa, Alabama, for psychiatric evaluation to determine: a) whether the appellant was mentally competent at the time of the alleged capital murder and burglary, and b) whether the appellant was competent to counsel with his attorneys and competent to stand trial. *Page 221 
While at Taylor Hardin, the appellant was evaluated extensively by the psychiatrists. The Lunacy Commission prepared a report of its findings from its evaluations of the appellant, which was filed with the trial court on September 18, 1985. The report stated, among other things:
 "There did not appear to be any basis to support that Mr. Garrison was suffering from any bizarre thinking or perceptions relative to a significant mental disease or defect at the time of the alleged offense. . . . .
 "Dr. Huggins added that the defendant appears to be fully aware of the events which surround the incident. He was aware of his actions but preferred not to discuss the incident. He freely discussed his actions and the events leading up to the incident. It appears that the defendant had good reality contact at the time of the alleged incident. He seems to have acted appropriately with his immediate environment and his behavior was goal directed. It was the Lunacy Commission's finding that the defendant appears competent at the time of the alleged offense. He did not appear to be suffering from any mental or physical impairment which would have affected his thinking or behavior at the time of the alleged incident. Therefore, an insanity defense does not appear to be supported in this matter.
"SUMMARY AND RECOMMENDATIONS
 "Mr. Garrison appears competent to stand trial and it is believed by the Lunacy Commission that he was responsible for his actions at the time of the alleged crime. Mr. Garrison's evaluation has been completed. It is recommended that he be returned to court for continuation of his legal proceedings." (emphasis added)
The assertion of the appellant that the Lunacy Commission did not address the question of his competency at the time of the crime is contradicted by the record.
On February 26, 1986, some five months after the Lunacy Commission's report was filed, the appellant, an indigent, entered a plea of not guilty by reason of mental disease or defect and filed a motion for private psychiatric and psychological examination and testing, along with numerous other motions. The appellant contends that the trial court erred to reversal in denying this motion for further evaluation. In support of this argument, the appellant relies on the United States Supreme Court's decision in Ake v.Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), which states that "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a physchiatrist's assistance on the issue if the defendant cannot otherwise afford one."470 U.S. at 74, 105 S.Ct. at 1092.
However, the Ake decision does not entitle an indigent defendant to funds to hire a private psychiatrist of his choosing. Ake, 470 U.S. at 83, 105 S.Ct. at 1097. Upon the request of the appellant, the trial court ordered the evaluation at Taylor Hardin, which addressed both the appellant's competency to stand trial and his mental state at the time of the offense. Relying on the finding of that evaluation, the trial court denied the appellant's request for further psychiatric examination. The "determination of whether a reasonable doubt of sanity exists is a matter within the sound discretion of the trial court." Holmes v. State,497 So.2d 1149, 1151 (Ala.Cr.App. 1986), quoting Campbell v. State,484 So.2d 1168, (Ala.Cr.App. 1985).
There were no facts to suggest that the accused was anything but sane; the suggestion arises only from his plea and motion.
We do not consider that the trial court abused its discretion. The report of the Lunacy Commission left no reason to suspect that mental disease or defect played any role in this crime and serves to justify the denial of the appellant's motion for further evaluation. See, Clisby v. State,501 So.2d 480, aff'd, 501 So.2d 483 (Ala. *Page 222 
1986). Therefore, we find no grounds for reversal on this issue.
 II
Appellant Garrison also contends that his conviction must be reversed on grounds that it was based exclusively upon the uncorroborated testimony of accomplices. We do not agree. The testimony of Randy Self, who was indicted with the appellant, was sufficiently corroborated by the testimony of Zane Leslie Garrison, who was not related to the appellant or to appellant's brother, Nathaniel (Nathan) Garrison. He shared an apartment with Nathan Garrison.
Zane Garrison testified that approximately one week prior to the incident he overheard a conversation between the appellant and the appellant's brother Nathan Garrison. They were talking about ways to get money to buy Christmas presents. Zane also testified that he overheard another conversation between the same two persons and Randy Self on December 24th. In this conversation, the three discussed plans to get microwave ovens and refrigerators from a mobile home plant to sell to J.W. Tubbs. They also discussed what they would do if a guard was on duty. "The test for determining whether there is sufficient corroboration of the testimony of an accomplice consists of eliminating the testimony given by the accomplice and examining the remaining evidence to determine if there is sufficient incriminating evidence tending to connect the defendant with the commission of the offense." Tarver v. State, 500 So.2d 1232
(Ala.Cr.App. 1986), citing, Miller v. State, 290 Ala. 248,275 So.2d 675 (1973), (emphasis supplied). The testimony of Zane Garrison was alone sufficient to "tend to connect" the appellant with the offense. The appellant argues that Zane Garrison is an unindicted co-conspirator. However, our review of the record reveals no evidence that would make him an accomplice in this case. Zane was not included in either of the conversations between the appellant and the others involved. Neither was he aware of their intentions to carry out this crime when he allowed Nathan Garrison to borrow his car, something he did frequently. Zane happened to be present in the apartment he shared with Nathan when the crime was being planned. From the record, we conclude that he was not an accomplice. This testimony corroborates the testimony of Randy Self, and the evidence is therefore sufficient to support the conviction.
 III
From appellee's brief we quote:
 "Mike Lee, a medical examiner and field agent for the Department of Forensic Sciences in Tuscaloosa testified that he assisted Dr. Santina with the autopsy of the victim, Willie Floyd Bartlett. Lee stated that he had a degree in mortuary science and had been a deputy coroner. Lee described the wounds to the body that he had observed, including a large laceration to the back of the head that appeared to penetrate completely through the scalp to the skull. Lee explained the procedure Dr. Santina went through in compiling the autopsy report, a procedure that has been followed the seven years Lee has been at Forensic Sciences. He stated that the report was consistent with their normal reporting system. Lee stated that he reviewed the autopsy report and it is consistent with what Lee observed at the autopsy. He stated that the original of the report is retained by the Department of Forensic Sciences.
 "Dr. McDuffie, the Tuscaloosa laboratory director and criminalist for the Department of Forensic Sciences, testified that he also assisted Dr. Santina with the autopsy of Mr. Bartlett. McDuffie explained the Department of Forensic Sciences' policies and procedures with reference to reports of autopsies. He said the reports are public records kept in the normal course of business of the Department of Forensic Sciences. McDuffie is the custodian of the records involving autopsies in Tuscaloosa and he identified State's Exhibit 20 as an exact copy of the cover letter and autopsy report prepared by Dr. Santina in connection with Mr. Bartlett's autopsy. *Page 223 
McDuffie said it had been in his custody from the time it was prepared until the present time. According to Dr. McDuffie, Dr. Scheuerman examined this file in McDuffie's presence.
 "Dr. Scheuerman, a forensic pathologist with the Department of Forensic Sciences in Tuscaloosa, testified that he had reviewed the facts and data in Dr. Santina's report of Mr. Bartlett's autopsy. Based on the observations in that report and on his own training and experience, Dr. Scheuerman formed a conclusion as to the cause of Mr. Bartlett's death.
 "The testimony of Lee and Dr. McDuffie established this autopsy report as a business record kept in the ordinary course of business of the Department of Forensic Sciences which would have been admissible under the Business Records Exception. . . . Dr. Santina's opinion as to the cause of death was not admitted into evidence. Dr. Scheuerman gave his opinion based on the facts set out in the report and Dr. Scheuerman was available for cross-examination by this defendant."
The distinguishing characteristic of this case, as opposed toSeay v. State, 390 So.2d 7 (Ala.Cr.App. 1979), relied on by Garrison, is that the opinion or conclusion of the absent doctor was never offered into evidence. Having Dr. Scheuerman present in the courtroom and testifying to his conclusion as to cause of death provided the "confrontation" with witnesses envisioned by the authors of the Sixth Amendment to the U.S. Constitution.
This case is due to be affirmed.
AFFIRMED.
All the Judges concur.