Virgil Lee Brownlee was convicted of murdering Lathen Aaron Dodd during a robbery and, pursuant to § 13A-5-40(a)(2), Codeof Alabama 1975, was sentenced to death by electrocution. Seven issues are raised on appeal.
The evidence presented by the State tended to establish that somewhere between 8:30 and 9:00 p.m. on May 19, 1986, two gun-wielding men, depicted in the evidence as Virgil Lee "Bobby" Brownlee and Robert Harris, charged into Jodie's Lounge on Highway 31 in North Birmingham shouting obscenities, shooting their pistols, and ordering the bar's patrons (14 to 18 in number) to lie on the floor. The evidence is unclear as to how many shots were initially fired. However, taking the patrons' testimony as a whole, as few as two and as many as ten shots were fired.
Self-confessed accomplice Willie Irving Goodgame, also armed with a pistol, was stationed at the entrance to prevent incoming patrons from impeding the robbery of the bar and its patrons.
While lying face down on the floor, the bar's patrons were kicked and pistol whipped. One patron received a grazing bullet wound to the head, and another suffered a broken shoulder. The patrons were robbed of their monies, identification papers, and personal effects, including rings, watches, and other items of jewelry. One patron was also robbed of the pistol she carried in her handbag.
At the same time the patrons were being robbed of their possessions, another of the robbers demanded to know who was the owner. Lathen Aaron Dodd, standing at the telephone talking to his brother, said "I am." Dodd was instructed to come over to the cash register and give this robber its contents. Thereafter, this robber, who seemed to be in charge of the operation, demanded "Where is the rest of the money?" On learning that there was no more money forthcoming, this robber fired two more times, and in the words of one of the patrons: "one of them was body impact." Another of the robbers jumped up on the bar and fired two more shots. The patrons *Page 154 
were then made to crawl into the men's room in the back of the bar, and the robbers fled the scene.
The patrons huddled in the rest room until they felt it was safe to come out. When they made their way back into the bar, they discovered that Lathen Aaron Dodd had been shot in the abdomen. Dodd was still alive, but later died on the operating table. The cause of his death was listed as bleeding caused by a gunshot wound to the chest/abdominal area. He had been unarmed at the time of the shooting, and his pistol was still lying on a shelf behind the bar counter when the police arrived.
Although both Goodgame and Harris were positively identified by the patrons, no patron could positively identify Brownlee as one of the robbers or the assailant. Brownlee made no incriminating statement to the police, and there was no scientific evidence tying him to the crime.
The State's case was based on the testimony of Willie Irving Goodgame, a self-confessed accomplice to the robbery component of the capital offense, James "Sonny" Warren, and the defendant's girl friend, Reavor Jones.
Goodgame testified that the defendant formulated the robbery. According to him, Brownlee stated a few hours before the robbery, "I know where there is a lick," meaning where they could get some money. The defendant, Goodgame, and Harris discussed how to pull the robbery, and they armed themselves with a .357 Magnum, a .38 pistol with a sawed-off barrel, and a regular .38 pistol, respectively. Goodgame stated that they drove to Jodie's Lounge in "Sonny" Warren's car and that Warren stayed in the car while the others went in and robbed the bar. The statement that Warren was involved was disputed by Warren.
According to Goodgame, when he, Harris and Brownlee arrived at the bar, Goodgame was posted at the entrance and stayed there throughout the robbery. He maintained that he never fired any shots. Goodgame further testified that he did not see whether it was Harris or Brownlee that shot Dodd, but that subsequent to the robbery, when the spoils were being divided between them, Brownlee stated to Harris: "He had gone for his pistol. . . . I had to kill the M_____ F_____ because he went for his pistol." Moreover, Goodgame said that the next day defendant stated: "If I wouldn't have shot him, he would have shot me."
Part of Goodgame's testimony was corroborated by that of "Sonny" Warren and Reavor Jones. Warren and Jones testified that the defendant, Harris, and Goodgame locked themselves up in the bedroom of Reavor Jones's apartment for an unspecified period of time. When they came out they were all armed with guns. Defendant asked Warren if he could borrow his car. Warren was initially unwilling to let Brownlee borrow his car, but eventually agreed. However, Warren stated that he had no knowledge of the planned robbery. Warren and Jones said that Brownlee, Harris, and Goodgame then left Reavor Jones's apartment and were gone for approximately two hours. Warren and Ms. Jones, according to their own testimony, remained at Ms. Jones's apartment. When they returned they again went back to the bedroom and closed the door behind them. Some time later, Warren entered the bedroom and saw a number of wallets and jewelry spread out on the bed. Later, the defendant, Goodgame, and Harris emerged from the bedroom to "shoot" or "snort" some cocaine, smoke some marijuana, and take some "T's" and "Blues." At some point, Harris almost overdosed and the group talked about taking him to a hospital.
The next day Goodgame and the defendant attempted to sell their weapons and the gun stolen from one of the patrons of Jodie's Lounge to Booker T. Harris. However, Harris was willing to buy only two of the weapons, leaving Goodgame and the defendant with the .357 Magnum. The defendant and Goodgame also disposed of the emptied wallets and identification papers taken in the robbery by going behind Ms. Jones' apartment and throwing them into Village Creek. Investigators from the Birmingham *Page 155 
Police Department later recovered some of these identification papers from the banks of Village Creek directly behind Ms. Jones' apartment. The investigators also recovered the weapons sold to Booker T. Harris by the robbers. This concluded the State's case. The defendant offered no testimony.
 I
The defendant first contends that the trial court violated the rule of Witherspoon v. Illinois, 391 U.S. 510,88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), in excluding for cause Jurors Bellenger and Sartino. Specifically, he argues that these two jurors indicated that they would be reluctant to impose the death sentence, but that under the right circumstances they would be able to do so. We disagree.
We have recently addressed this same issue in the case ofWatkins v. State, 509 So.2d 1071, 1073-74 (Ala.Cr.App. 1986),aff'd, 509 So.2d 1074 (Ala. 1987), cert. denied, ___ U.S. ___,108 S.Ct. 269, 98 L.Ed.2d 226 (1988), wherein we held as follows:
 "There are a number of recent United States Supreme Court cases on this point which are controlling authority. The original constitutional yardstick was described in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). There the Court required that the juror make it unmistakably clear that he would automatically vote against capital punishment and that his feelings would prevent him from making an impartial decision as to guilt. This is no longer the test. Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581
(1980), ruled that only those jurors whose views on capital punishment would prevent or substantially impair the performance of their duties could be challenged for cause. Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), held that the test for excluding a venireman is whether the juror's views would prevent or substantially impair the performance of his duties in accordance with his instructions and oath. The Court expressly stated that the juror's bias did not have to be proved with unmistakable clarity. Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), stated in part as follows:
 " 'The precise wording of the question asked of [the venireman], and the answer he gave, do not by themselves compel the conclusion that he could not under any circumstances recommend the death penalty. But Witt recognized that "determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." [469] U.S., at [424] [105 S.Ct., at 852]. The trial court, "aided as it undoubtedly was by its assessment of [the venireman]'s demeanor," at [434] [105 S.Ct., at 857] was under the obligation to determine whether [the venireman]'s views "would prevent or substantially impair the performance of his duties as a juror," id., at [433] [105 S.Ct. at 857]. . . . No specific objection was made to the excusal of [the venireman] by defense counsel. Nor did the court perceive, as it had previously, any need to question further. Viewing the record of voir dire
in its entirety, we agree with the reasoning of the Court of Appeals that the trial court's decision to exclude this juror was proper. [Darden v. Wainwright] 767 F.2d, [752] at 754.'
 "The Eleventh Circuit Court of Appeals held in 1983 in McCorquodale v. Balkcom, 721 F.2d 1493
(11th Cir. 1983), cert. denied, 466 U.S. 954, 104 S.Ct. 2161, 80 L.Ed.2d 546 (1984), that a prospective juror who responded to the death penalty questions, 'I don't think I could do it. I really don't,' has made it sufficiently clear that she could not impose the death penalty regardless of the evidence. The Eleventh Circuit stated:
 " 'Her statements, coupled with the trial judge's ability to observe [her] tone of voice and demeanor for indecisiveness, allow only one reasonable interpretation of her repetitive statement, "I don't think I could do it. I really don't": she unequivocally believed that *Page 156 
she could not impose the death penalty regardless of the evidence presented.' 721 F.2d at 1500-01.
 "The Fifth Circuit in Martin v. Maggio, 711 F.2d 1273 (5th Cir. 1983), even held that the following equivocal responses would establish the necessary predicate for disqualification: 'I don't know if I would vote for the death penalty.' and 'I don't know if I could do it.' These are all euphemistic expressions of 'no.' "
In the course of the voir dire examination, seven members of the venire indicated their opposition to the death penalty. Each of these venire members was questioned specifically about the nature and degree of his/her opposition to the death penalty and to what extent it would affect his/her decision as a juror. The questioning was done one at a time in chambers. As a result of this questioning, the prosecutor did not challenge one of the seven prospective jurors. The prosecutor challenged one other juror unsuccessfully. The remaining five jurors were removed from the venire as a result of the prosecutor's challenges for cause. However, on appeal, the appellant argues only that two of these five jurors — Jurors Bellenger and Sartino — were erroneously removed. The examination of these jurors follows:
"THE COURT: Mrs. Bellenger, I hope you don't feel like you are on the spot, ma'am. I know your hand went up on the question about capital punishment?
"A. Yes.
"THE COURT: So this is an occasion for you to express yourself in your own words about your feelings about capital punishment. I imparted to you and the others that I asked you, in effect — well, several questions — but you are irrevocably committed now before we ever start, are you saying to these men and to me that you could not and would not impose the death penalty under any circumstances?
"A. Well, I just feel like I wouldn't be able to stand in judgment of another person where their life is concerned.
"THE COURT: Okay. Well, in effect, since the law imposes upon a juror in these circumstances the duty to at least conscientiously consider death by electrocution, are you saying to me that you could not; that your abilities to be a conscientious juror would be impaired?
"A. Right.
"THE COURT: Mr. Dunn, do you have any questions?
"MR. DUNN: Mrs. Bellenger, are there not any circumstances that you can think of wherein you would hear some evidence that would convince you that you should impose the death penalty?
"A. Well, I have never had a crime close to me, but maybe if, you know, if I had, I might feel differently. A child or a husband or —
"MR. DUNN: So, your answer is yes, then, you could envision some circumstances?
"A. Yes.
"MR. DUNN: Okay. Thank you.
"THE COURT: And those circumstances would have to pertain to your family members, is that what you are telling me?
"A. I think so. Could I say one other thing?
"THE COURT: Yes, ma'am.
"A. I have had a lot of emotional problems and now I am all right, except I'm very nervous. And I don't know whether I, you know, would be able to make a good judgment or not. I feel like I certainly can sit on a jury in some cases, but maybe not on a capital.
"THE COURT: Yes, ma'am.
"A. Not on a long, drawn-out trial.
"THE COURT: Okay. Appreciate you being with us. You will retire back to the general area. You know you have to sit on that bench out there, but don't discuss what we said in here.
"A. All right.
"THE COURT: Thank you so much.
"(Whereupon, Mrs. Bellenger left the chambers.) *Page 157 
"THE COURT: Don, when I don't ask you if you have any questions, it means you are all right, as far as I'm concerned. You understand that?
"MR. RUSSELL: Yes, sir.
"THE COURT: I am going to withhold my rulings on all of them.
"MR. RUSSELL: Yes, sir. We challenge Mrs. Bellenger.
"THE COURT: Yes.
"MR. DUNN: We object.
"THE COURT: I will knock her off, because it is obvious her ability to sit as a conscientious juror is impaired, in her own words."
". . .
"THE COURT: How do you do, Mr. Sartino?
"A. Fine.
"THE COURT: Your hand went up on the death penalty question?
"A. Right.
"THE COURT: Could you conscientiously consider death by electrocution as a mode of punishment if you were cast in the role of a juror in the guilt phase, or any circumstances under which you could impose the death penalty?
"A. A few years back I feel like I could, but now that I think about it and ponder about it on different situations, I don't see morally where it is right. It is not a judgment that another human being — we have the right to give upon another one. Now, lifetime incarceration, I do agree with it.
"THE COURT: All right. In this business, we have to try to pin folks down and corner them if we can. So, I am going to pursue this a little further, I apologize.
"Some people just don't know how they feel about a certain serious subject. Some things don't have a yes or no answer. Are you irrevocably committed to voting against the death penalty before you have ever heard any evidence? Are you unalterably opposed to capital punishment?
"A. Yes, I am.
"THE COURT: Unalterably?
"A. Right.
"THE COURT: And finally, this will be the last approach I will make to you. And I appreciate your feelings about morally being opposed to the death penalty. But the State law that we deal with imposes upon you jurors the responsibility to conscientiously consider death by electrocution. I take it that you could not conscientiously consider it?
"A. No, I couldn't myself at this time.
"THE COURT: All right. Do you have any questions, Mr. Dunn.
"MR. DUNN: Mr. Sartino, are there not any circumstances whatsoever, can you not envision any facts bad enough where if proved to you that from the evidence that you could consider that option, as punishment?
"A. The way I am looking at it now is that — let's take it out of a moral standard — that once a person is put into prison, say life without parole, then he is taken away from the system at that point, but he has a time more to reflect back on his deed. But he also has more of a time to repent. And maybe at that time he'd be able, if he does repent, say, he would be able to convey this over to others. At the time of his death, it would just shorten his time that he has, to change or not.
"MR. DUNN: I see what you are saying.
"A. It may sound weak, but I have seen people — the death penalty itself to me — when he asked the question is a deterrent, I believe it is, but I believe it is also a deterrent to get away more too, not to get caught.
"MR. DUNN: As a juror, if you became a member of this jury in this case, are there not any circumstances bad enough where if you came down to just saying this man either gets life without parole, or he gets the death penalty, and you got down to that point in the case, could you conscientiously consider imposing the death penalty, not knowing anything about the case right now?
"A. Right. I think I would at all possible means deter away from the death penalty. *Page 158 
"MR. DUNN: You would still consider it?
"A. I think due to my way of thinking in the past, I believe it would enter my mind.
"MR. DUNN: Okay. Thank you.
"THE COURT: That always means that the other lawyer wants to ask a question.
"MR. RUSSELL: Well, let me see if we can get this straight. Could you impose the death penalty, could you conscientiously consider it, or would you just consider it and then let it pass by, or would you conscientiously consider it if you found the defendant guilty and then went back to set punishment?
"A. I could —
"THE COURT: As opposed to whimsically or capriciously?
"A. Right, I understand. I'll put it this way. I would be sure to myself that I have exercised every possible means to my way of thinking on the subject at the time. I would have to — I would be sure myself, completely convinced.
"MR. RUSSELL: Let me put it this way: First phase of the trial is guilt or innocence, that is the first phase. If you should find the defendant guilty beyond a reasonable doubt and to a moral certainty that he was guilty, or that he is guilty of the crime charged in the indictment which is capital murder, then the jurors will retire again after another hearing to determine punishment. You have already found him guilty. Okay?
"Now you must set punishment, either life without parole or death by electrocution. Would you totally disregard the imposition of the death penalty?
"A. I believe at that point, I would.
"MR. RUSSELL: Fine, thank you.
"MR. DUNN: Nothing further.
"THE COURT: At that point in the punishment phase?
"A. Right. I believe I would. I am almost certain.
"THE COURT: Thank you very much. Don't mention what we said in here and take your recess with the other folks.
"(Mr. Sartino left the chambers.)
"MR. KENDRICK: Your Honor, could I make an objection at this point in time to Mr. Russell using the phrase 'impose the death penalty' or 'give the death penalty', as opposed to 'recommend the death penalty'?
"THE COURT: Actually, the jurors should in no wise ever be communicated to these jurors that their verdict is advisory only. You don't take any weight off the jurors.
"MR. RUSSELL: No, sir. I would never say that. There is a law. We challenge Mr. Sartino for cause.
"MR. DUNN: We object. He is equivocal in his answers. He states to me at one time that he could consider the death penalty, and the question from the District Attorney says that he would not, he'd rule it out. I think we are entitled to the benefit of the doubt.
"THE COURT: I agree with you, but there is no doubt in my mind. This man is trying to be conscientious. He is saying to us that he could not impose the death penalty.
"MR. RUSSELL: That is what he said.
"THE COURT: That is how I read it.
"MR. DUNN: Well, I don't think that is what he said when I was questioning him.
"THE COURT: Well, that's right. That is always true. This guy seems particularly conscientious, though. And communicated to me that he could not be a conscientious juror in the punishment phase. That he couldn't be impartial. Obie Robinson in lieu of Peter Sartino.
"MR. DUNN: We except."
Juror Sartino was subsequently recalled for additional questions regarding his beliefs about capital punishment. These remarks are set out below:
"THE COURT: Let me ask you this. I believe I mentioned to the venire out there, the large group of people, that if we got to the punishment phase, the jury will be instructed *Page 159 
by myself regarding statutory or legal aggravating factors. You have got to consider this, that or the other, I will spell it out for you, versus mitigating factors. The law is very specific in what a Judge can tell a jury sitting in punishment.
"Now, back to that conscientious role of the juror. Could you, again — could you, in your punishment role as a juror, if you were so involved, conscientiously consider the Court's charge to the jury?
"A. Conscientiously, I could.
"THE COURT: Yes.
"A. I was walking around out there after we talked a while ago, you know, reflecting back and I just — I can't — the death penalty is just right now is just beyond me. It is something I do not agree with.
"THE COURT: Okay. I just wanted to make sure. You could not impose the death penalty?
"A. I think I would consider, like I said to myself, you know, what you are trying to tell me and what the law requires. But I am just saying I do not agree, and I myself would not — if it was up to me, if I was down to the last person, I would say no.
"THE COURT: Well, every juror votes his own opinion.
"A. Right.
"THE COURT: And you are telling me at this point in time that you could not; you're irrevocably committed to the proposition that you could not impose death by electrocution?
"A. Uh-huh. I am positive of it.
"THE COURT: Thank you very much.
"(Whereupon, Mr. Sartino left the chambers.)
"THE COURT: Well, I am not going to change my opinion on Mr. Sartino.
"MR. RUSSELL: You had already given us challenge for cause.
"THE COURT: I have, but I wanted to reconsider in light of that question about statutory aggravation and mitigation. I just wanted to talk to him again and that is what we did."
Our examination of the lengthy voir dire examinations of these two prospective jurors convinces us that their responses were sufficiently positive to justify and require their disqualification as jurors. In addition to the words, the trial judge had the opportunity, which we do not have, to observe the equally important manner of speech, demeanor, body language, tone, and appearance of these two prospective jurors. No error was committed by the trial judge in granting the State's challenges of these two jurors for cause, or for that matter, the three jurors removed for cause but whose removal is not complained of here.
 II
The defendant next contends that he was convicted on the uncorroborated testimony of his accomplices, Willie Irving Goodgame and James "Sonny" Warren, in violation of § 12-21-222,Code of Alabama 1975, which provides as follows:
 "A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."
"An accomplice is defined as 'an associate in crime; a partner or partaker in guilt.' Darden v. State, 12 Ala. App. 165,167, 68 So. 550, 551 (1915)." Jacks v. State,364 So.2d 397, 401-02 (Ala.Cr.App.), cert. denied, 364 So.2d 406
(Ala. 1978).
 "Section 12-21-222 provides that one cannot be convicted of a felony on the uncorroborated testimony of an accomplice. For the corroboration requirement of this section to apply, however, 'it must clearly appear that the witness in question is an accomplice. Ross v. State, 74 Ala. 532
(1883); Lowery v. State, 38 Ala. App. 505, 88 So.2d 854 (1956).' Perry v. State, 368 So.2d 305, 309
(Ala.Crim.App. 1978), reversed on other grounds, 368 So.2d 310 (Ala. 1979). The defendant who alleges that a witness is an accomplice *Page 160 
has the burden of so proving, unless the evidence presented by the prosecution shows without dispute that the witness is an accomplice. Jacks v. State, 364 So.2d 397, 403 (Ala.Crim.App.), cert. denied, 364 So.2d 406 (Ala. 1978).
". . .
 "It has often been stated that '[t]he test for determining whether a witness is an accomplice is whether he or she could have been indicted and convicted for the offense charged, either as principal or accessory.' Dial v. State, 387 So.2d 879, 881 (Ala. 1980) (quoting Russell v. State, 365 So.2d 343 (Ala.Crim.App. 1978); Jacks, supra, 364 So.2d at 401; White v. State, 352 So.2d 29, 31
(Ala.Crim.App. 1977). . . .
 "In Jacks, supra, 364 So.2d at 402, we find the following language:
 " '[W]hen intent is one of the required constituent elements [of a crime], the co-conspirator, or accomplice, to authorize his conviction, must himself have entertained the intent, or must have known that the actor, whom he was encouraging, aiding, or abetting, entertained it. Without this individual intent, or personal knowledge, it can not be affirmed that he aided or abetted in the crime charged. . . .' (Quoting Tanner v. State, 92 Ala. 1, 7, 9 So. 613, 615 (1890).)"
Ex parte Bates, 461 So.2d 5, 6-7 (Ala. 1984).
There is no question that Goodgame was an accomplice of the defendant's. His admitted participation in the robbery rendered him an accomplice as a matter of law and, therefore, his testimony required corroboration. See Craig v. State,376 So.2d 803, 804 (Ala.Cr.App.), cert. denied, 376 So.2d 807 (Ala. 1979). Thus, we find that the trial court correctly determined that Goodgame was an accomplice of Brownlee's and that his testimony had to be corroborated.
We must now determine whether the trial court correctly determined that the accomplice status of Warren was a question of fact, not of law, and therefore a matter for the jury's determination.
Whether a witness is an accomplice may be a question of law or fact, depending on the particular circumstances of the case; however, the question of complicity is usually a question of fact. Jacks v. State, supra, 364 So.2d at 403. Complicity becomes a question of fact for the jury's determination where there is a doubt or dispute concerning the complicity of a witness and the testimony is susceptible to different inferences on that point. Ex parte Bell, 475 So.2d 609, 612
(Ala.), cert. denied, 474 U.S. 1038, 106 S.Ct. 607,88 L.Ed.2d 585 (1985).
Here, the evidence as to whether Warren was an accomplice of Brownlee was clearly in dispute. Goodgame testified that Warren was the "wheel man" in the robbery-homicide. However, Warren himself, as well as Reavor Jones, testified that Warren remained at Ms. Jones's apartment that night while the defendant borrowed his car and left with Harris and Goodgame. Thus, the question of whether Warren was an accomplice of the defendant was one for the jury to decide. Brownlee, however, further contends there was evidence that Warren knew that the defendant, Harris, and Goodgame intended to commit a robbery, and lent them his car in furtherance of their plan. This contention is supported by neither the evidence nor the law. The testimony of both Goodgame and Warren established that Warren was excluded from the bedroom meeting where Brownlee, Harris, and Goodgame planned the robbery of Jodie's Lounge. The evidence is also undisputed that Warren was further excluded from the post-robbery bedroom meeting at which the perpetrators divided the proceeds on their crime between them. Moreover, the mere fact that Warren unwillingly allowed the trio to borrow his car, something he had done on at least one prior occasion, does not make him an accomplice to capital murder. SeeGarrison v. State, 520 So.2d 219 (Ala.Cr.App. 1987). Finally, the defendant argues that Warren was an accomplice because he (the defendant) gave him some cash from the proceeds of the robbery. Warren insisted, however, that this was compensation for the damage done to his transmission by Goodgame *Page 161 
when Goodgame had borrowed his car some weeks earlier. We find, therefore, that the issue of Warren's accomplice status presented a question of fact for the jury. Accordingly, the trial court's determination on this was correct.
Even if, arguendo, both Goodgame and Warren were found to be accomplices of the defendant, we find that the testimony of Ms. Jones was sufficiently corroborative to allow the admission of their testimony into evidence against Brownlee. " 'The test for determining whether there is sufficient corroboration of the testimony of an accomplice consists of eliminating the testimony given by the accomplice and examining the remaining evidence to determine if there is sufficient incriminating evidence tending to connect the defendant with the commission of the offense.' Miller v. State 290 Ala. 248, 275 So.2d 675
(1973)." Tarver v. State, 500 So.2d 1232, 1247 (Ala.Cr.App.),aff'd, 500 So.2d 1256 (Ala. 1986), cert. denied, 482 U.S. 920,107 S.Ct. 3197, 96 L.Ed.2d 685 (1987). Furthermore, it is not necessary that the corroborative evidence be strong enough or sufficient in itself to constitute proof beyond a reasonable doubt. Jackson v. State, 451 So.2d 435, 437 (Ala.Cr.App. 1984);Woods v. State, 387 So.2d 313, 314 (Ala.Cr.App. 1980); Thompsonv. State, 374 So.2d 388, 389 (Ala.Cr.App. 1979). Indeed, as this court stated in Ingle v. State, 400 So.2d 938, 940
(Ala.Cr.App. 1981), "[c]orroboration need only be slight to suffice." Ms. Jones, who no one suggests was an accomplice, testified that she saw Goodgame, Harris, and the defendant leave her apartment shortly before the time of the robbery. After the approximate time of the robbery, Ms. Jones said, she witnessed the trio's return. At that time, they had in their possession a sawed-off pistol and a large array of jewelry. Furthermore, she said the trio spoke of shooting into the air. According to the testimony of the surviving victims of the Jodie's robbery, the robbery was committed by three black men: Goodgame, Harris, and an unidentified male. Moreover, one of the perpetrators was armed with a sawed-off pistol. Finally, during the commission of the robbery, the robbers fired their weapons into the air and stole the jewelry of the patrons. Accordingly, defendant's contention that he was convicted on uncorroborated accomplice testimony must fail.
 III
The defendant next contends that he was so intoxicated at the time of the offense that he lacked the requisite intent to be found guilty of capital murder. We disagree.
Although voluntary intoxication due to drugs is not a defense to a criminal charge, Allen v. State, 502 So.2d 389, 392
(Ala.Cr.App. 1986), such intoxication may render the accused incapable of forming the intent necessary to constitute the offense. Foust v. State, 414 So.2d 485, 487 (Ala.Cr.App. 1982).
 "It is true that the degree of intoxication necessary to negate specific intent and, thus, reduce the grade of an offense must amount to 'insanity.' Maddox v. State, 31 Ala. App. 332, 334, 17 So.2d 283, 285 (1944). Mere drunkenness, voluntarily produced, is never a defense against a criminal charge, and can never palliate or reduce the grade of an offense, unless it is so extreme as to render impossible some mental condition which is an essential element of the criminal act. Gautney v. State, 284 Ala. 82, 222 So.2d 175 (1969); Walker v. State, 91 Ala. 76, 9 So. 87 (1891). Partial intoxication will not avail to disprove the specific intent; the intoxication must be of such character and extent as to render the accused incapable of discriminating between right and wrong — stupefaction of the reasoning faculty. Green v. State, 342 So.2d 419 (Ala.Cr.App. 1977).
 "However, it is equally clear that the degree of intoxication exhibited by an accused, such as to reduce murder to manslaughter, even where the evidence is in sharp conflict, is for the jury to decide. Helms, [v. State, 254 Ala. 14, 47 So.2d 276
(1950)] supra; Chatham v. State, 92 Ala. 47, 9 So. 607 (1891); Maddox, supra." *Page 162 
Crosslin v. State, 446 So.2d 675, 681-82 (Ala.Cr.App. 1983).
Our examination of the evidence convinces us that the jury was not required to find that the defendant lacked the requisite intent due to intoxication. The only evidence regarding intoxication presented at trial was that while planning the robbery, the defendant, Harris, and Goodgame "did some drugs." There was no evidence, however, that this preliminary drug use deprived the defendant or any of his accomplices of their faculties. Indeed, the record reflects that the defendant and his cohorts did not get down to any serious drug use until after the robbery was over and the proceeds had been split up between them. This was when co-defendant Harris almost overdosed and the group discussed taking him to the hospital for treatment. The evidence is clear that the defendant knew exactly what he was doing throughout the course of the robbery. In our judgment, the jury had ample evidence before it to warrant its finding on the question of the defendant's intent.
 IV
The defendant further contends that the weight and sufficiency of the evidence was insufficient to sustain a capital murder conviction. Specifically, Brownlee argues that the State failed to prove that the killing of the victim, Lathen Aaron Dodd, was intentional.
To sustain a conviction for capital murder under §13A-5-40(a)(2), Code of Alabama 1975, the State must prove beyond a reasonable doubt: (1) A robbery in the first degree or an attempt thereof, as defined by § 13A-8-41; (2) a murder as defined by § 13A-6-2(a)(1); and (3) that the murder was committed during the robbery or attempted robbery. Connolly v.State, 500 So.2d 57, 62 (Ala.Cr.App. 1985), aff'd, 500 So.2d 68
(Ala. 1986).
 "A killing is not accidental when the act causing death is done intentionally. Lewis v. State, 96 Ala. 6, 10, 11 So. 259 (1891). Any contention that the death was accidental 'ignores the nature of the enterprise that the defendant . . . [was] engaged in.' Sanders v. State, 16 Ala. App. 511, 513, 79 So. 504 (1918)."
Toles v. State, 484 So.2d 512, 515 (Ala.Cr.App. 1985); Phelps v.State, 435 So.2d 158, 165 (Ala.Cr.App. 1983). Moreover, as we have previously held, "Intent may be inferred from the use of a deadly weapon." Scanland v. State, 473 So.2d 1182, 1185
(Ala.Cr.App.), cert. denied, 474 U.S. 1035, 106 S.Ct. 602,88 L.Ed.2d 581 (1985). Thus, we find that there was sufficient evidence from which the jury could infer defendant's intent.
A verdict of conviction will not be set aside on the grounds of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this court that the guilty verdict returned against the accused was wrong and unjust. Sales v. State,435 So.2d 242, 246 (Ala.Cr.App. 1983); Williams v. State, 420 So.2d 819,821 (Ala.Cr.App. 1982); Ward v. State, 356 So.2d 238, 240
(Ala.Cr.App.), cert. denied, 356 So.2d 242 (Ala. 1978). This court is not so convinced.
Viewing the State's evidence presented to the jury, which is set out above, under the principles enunciated in Cumbo v.State, 368 So.2d 871, 874 (Ala.Cr.App. 1978), cert. denied,368 So.2d 877 (Ala. 1979), we find that, even though the evidence is circumstantial, when viewed in the light most favorable to the prosecution, it was sufficient to allow the jury to reasonably find that the evidence excluded every reasonable hypothesis except that of the defendant's guilt. The State's evidence established the following: The defendant and his two accomplices planned and carried out a robbery of Jodie's Lounge and its patrons. All three men were armed with pistols. One accomplice guarded the entrance and did not fire his weapon. No shots were fired by anyone other than the robbers. The owner of the lounge, Lathen Aaron Dodd, was shot during the robbery and died later at an area hospital. The trio returned to the apartment of defendant's girl friend to divide the spoils, whereupon defendant was heard to state, "I had to kill *Page 163 
the M_____ F_____ because he went for his pistol." Defendant and his accomplice Goodgame attempted to sell the weapons used in the robbery, as well as a pistol stolen during the incident, to another individual, but the individual purchased only two of the three weapons. Defendant and Goodgame also attempted to dispose of the wallets and personal papers taken during the robbery by throwing them into Village Creek, just behind his girl friend's apartment. They were not totally successful, however, as many of the items landed on the creek bank and were later recovered by investigators from the Birmingham Police Department. Police investigators also recovered the weapons that were sold to the individual by defendant and his accomplice. Clearly, the evidence was inconsistent with any reasonable theory of innocence. Indeed, all material circumstances in the evidence point to the defendant's guilt. Thus, we find that the evidence presented at trial was sufficient to sustain the defendant's conviction for capital murder.
 V
The defendant also argues that the trial court erred in denying his motion for a new trial based on newly discovered alibi evidence.
 "The granting or denial of a new trial on the ground of newly discovered evidence is a decision resting largely within the sound discretion of the trial court and the decision will not be reversed on appeal unless it is clearly shown that the trial judge abused his discretion. Snider v. State, 473 So.2d 579, 580 (Ala.Cr.App. 1985); Perry v. State, 455 So.2d 999, 1003 (Ala.Cr.App. 1984). Robinson v. State, 389 So.2d 144 (Ala.Cr.App.), cert. denied, 389 So.2d 151 (Ala. 1980). In order to establish the right to a new trial on the grounds of newly discovered evidence, appellant must show that the evidence has been discovered since the trial, that it could not have been discovered before the trial by the exercise of due diligence, that it is material to the issue, that it is not merely cumulative or impeaching, and that the evidence is such that it will probably change the result if a new trial is granted. Baker v. State, 477 So.2d 496, 504 (Ala.Cr.App. 1985), cert. denied, 475 U.S. 1029, 106 S.Ct. 1231, 89 L.Ed.2d 340 (1986); Willis v. State, 447 So.2d 199, 202
(Ala.Cr.App. 1983); Bland v. State, 390 So.2d 1098
(Ala.Cr.App.), cert. denied, 390 So.2d 1109
(Ala. 1980), cert. denied, 451 U.S. 991, 101 S.Ct. 2332, 68 L.Ed.2d 851 (1981)."
Griffin v. State, 500 So.2d 83, 91 (Ala.Cr.App. 1986).
The defendant's newly discovered evidence consisted of testimony by two women who said they had seen him across town at two different locations just before and again just after the time of the robbery and killing at Jodie's Lounge. Angie Flowers stated that she had waited on the defendant at the Crown Service Station on the Bessemer Super Highway around 9:00 or 9:30 p.m. on the night in question. Further questioning established that she had waited on him two or three times previously, but had neither seen nor waited on him since May 19, 1986. The second witness, Eveolene Fowler, stated that on May 19, 1986, she saw the defendant at the Delta Service Station on Finley Avenue around 8:15 or 8:30 p.m. She had never seen the defendant before that night and had not seen him since then. The State's evidence in opposition to defendant's motion for a new trial also consisted of the testimony of two witnesses. The first witness was the bailiff who returned defendant to his jail cell following his conviction for capital murder. The bailiff stated that on this occasion, he overheard the defendant remark that he was not "going to take this," and that he wanted to talk to a district attorney. Deputy District Attorney Don Russell stated that he was informed that the defendant wanted to talk to him about his conviction. Accompanied by the defendant's attorney, Mr. Russell visited the defendant in the county jail and had a conversation with him. The gist of this conversation was that defendant told the deputy district attorney he could not be the one who shot Lathen Aaron Dodd, since at the time of the shooting he was under a pool *Page 164 
table at Jodie's robbing one of the patrons of his electronic beeper. Thereafter, the defendant's motion for a new trial was denied.
A decision on a motion for a new trial rests largely within the discretion of the trial court, and in reviewing such a decision this court will indulge every presumption in favor of the correctness thereof. Baker v. State, 477 So.2d 496, 504
(Ala.Cr.App. 1985), cert. denied, 475 U.S. 1029, 106 S.Ct. 1231,89 L.Ed.2d 340 (1986). Moreover, the trial court is in the best position to determine the credibility of the new evidence. Isomv. State, 497 So.2d 208, 212 (Ala.Cr.App. 1986). Obviously, the trial court was not convinced of the credibility of defendant's newly discovered evidence. We find no abuse of the trial court's discretion in the instant case.
 VI
The defendant next contends that the trial court erred to reversal in failing to remove for cause three prospective jurors who had had personal contact with the victim, Lathen Aaron Dodd.
During voir dire examination, Juror Hawkins stated that he often drove past Jodie's Lounge, and that he had also taught driver's education to the niece of the victim. When asked by the trial judge whether these facts would affect his objectivity as a juror, Juror Hawkins replied "no." Juror Horsley knew the victim "[j]ust a little bit," as he had been a patron of Jodie's Lounge on several occasions and had shot pool with the victim. When questioned by defendant's attorney on whether his acquaintance with the victim would affect his verdict, Juror Horsley replied, "No. I will base it on the evidence." On further questioning Juror Horsley indicated that while he would rather not sit on the defendant's jury, he could and would base any verdict on the evidence. Juror Dominick was a friend of the victim's ex-wife and knew his daughter as well, but had no acquaintance with the victim. She stated that her relationship with the victim's family members would not affect her ability to render a fair and impartial verdict in any way.
We have held that the mere fact that a prospective juror is personally acquainted with the victim does not automatically disqualify a person from sitting on a criminal jury.Robinson v. State, 430 So.2d 883, 888 (Ala.Cr.App. 1983);Carlton v. State, 415 So.2d 1241, 1243 (Ala.Cr.App. 1982). Moreover, the trial court has broad discretion in determining whether to grant or deny challenges of prospective jurors for cause. Ex parte Nettles, 435 So.2d 151, 154 (Ala. 1983);Robinson v. State, supra, 430 So.2d at 888; Glenn v. State,395 So.2d 102, 107 (Ala.Cr.App. 1980), cert. denied, 395 So.2d 110
(Ala. 1981).
Here, the record shows that the trial judge examined the prospective jurors and that they all testified that their prior contacts with the victim would not affect their decisions if they were selected to serve as jurors in the instant case. Evidently, the trial judge was satisfied that there was no cause to excuse these three prospective jurors for probable bias or prejudice. Such a decision "is entitled to great weight and will not be interfered with unless clearly erroneous, equivalent to an abuse of discretion." Collins v. State,385 So.2d 993, 1000 (Ala.Cr.App. 1979), rev'd on other grounds,385 So.2d 1005 (Ala. 1980). Just as in Collins, we find here "that the trial court exercised its discretion prudently," and therefore its decision should not be disturbed.
 VII
Issue seven of the defendant's brief contends that the trial court committed reversible error in allowing the State to call to the attention of the jury his choice to exercise his Fifth Amendment right to remain silent following his arrest.
The complained-of conduct by the State took place during the testimony of Officer Quinn, and is set out below:
"Q. When was he arrested?
"A. Mr. Brownlee was arrested earlier.
 "Q. Did you have any conversation with him when he was arrested? *Page 165 
"A. Well, not —
"Q. If you know?
"A. Not really, no.
"Q. Did you ask him any questions?
"A. Yes I asked, but there was no conversation."
We initially note that there was no objection to this testimony during the trial. Generally, when no objection is made, nothing is preserved for our review. Bell v. State, 466 So.2d 167, 172
(Ala.Cr.App. 1985); Owen v. State, 418 So.2d 214, 219
(Ala.Cr.App. 1982); Gunn v. State, 387 So.2d 280, 282
(Ala.Cr.App.), cert. denied, 387 So.2d 283 (Ala. 1980).
However, defendant's failure to preserve this issue, "while weighing against defendant as to any possible claim of prejudice, serves as no impediment to our scope of review pursuant to the 'plain error' mandate in death penalty cases."Ex parte Bush, 431 So.2d 563, 565 (Ala.), cert. denied,464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983). Therefore, we must now consider whether the State's conduct constituted "plain error." Our Supreme Court has adopted federal case law defining plain error, holding that "[p]lain error only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings." Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert.denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). Seealso Ex parte Harrell, 470 So.2d 1309, 1313 (Ala.), cert.denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).
We find that these remarks did not seriously affect the fairness of the proceedings against the defendant. It is true that the use of post-arrest post-Miranda warning silence of the accused as evidence of guilt violates the due process clause of the Federal Constitution and, as well, violates our own State Constitution. Houston v. State, 354 So.2d 825, 828
(Ala.Cr.App. 1977), cert. denied, 354 So.2d 829 (Ala. 1978). However, in the instant case, just as in Dickey v. State,390 So.2d 1177, 1178 (Ala.Cr.App.), cert. denied, 390 So.2d 1178
(Ala. 1980), there was no direct reference to the silence of the defendant. Officer Quinn made no mention of whether defendant invoked his constitutionally protected right of silence following his arrest. The evidence simply shows that there was no conversation between Officer Quinn and the defendant. Therefore, no error occurred with regard to this testimony.
 VIII
As required by Beck v. State, 396 So.2d 645 (Ala. 1980), and §13A-5-53, Code of Alabama 1975, we have reviewed this case for any error involving the defendant's conviction and to determine the propriety of his death sentence.
The defendant, Virgil Lee Brownlee, was indicted and convicted of murder during the course of a robbery, which, pursuant to § 13A-5-40(a)(2), Code of Alabama 1975, is punishable by death.
There has been no argument made by the defendant that the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, and there is no evidence to support any such contention.
Our review of the sentence proceedings reveals that the trial court's findings concerning the aggravating and mitigating circumstances are supported by the evidence. The trial court found the existence of three aggravating circumstances. First, that the capital offense was committed by a person under sentence of imprisonment, § 13A-5-49(1). In Tarver v. State,500 So.2d 1232, 1250-51 (Ala.Cr.App.), aff'd, 500 So.2d 1256
(Ala. 1986), cert. denied, 482 U.S. 920, 107 S.Ct. 3197,96 L.Ed.2d 685 (1987), we held that this aggravating circumstance is present when a defendant commits the offense while he is on parole. Second, that the defendant was previously convicted of another capital offense or a felony involving the use or threat of violence to the person, § 13A-5-49(2). At the sentence proceeding it was established that the defendant had previously been convicted of four counts of robbery. Third, that the capital offense was committed while the defendant was engaged in the commission of a robbery, *Page 166 
§ 13A-5-49(4). This circumstance was sufficiently proven by the jury's verdict at the guilt phase of the defendant's trial. After considering each of the statutory mitigating circumstances set out in § 13A-5-51, and the possibility of any non-statutory circumstances as allowed by § 13A-5-52, the trial court found the existence of no mitigating circumstances. This finding was also supported by the evidence.
Our independent weighing of the aggravating and mitigating circumstances convinces us of the propriety of the death sentence in this case.
Moreover, we are convinced that the death sentence is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Indeed, fully two-thirds of Alabama death sentences have been imposed on defendants convicted of robbery-homicides. Beck v.State, supra, 396 So.2d at 654 n. 5; see also, e.g., Bell v.State, 475 So.2d 601 (Ala.Cr.App. 1984), aff'd, 475 So.2d 609
(Ala.), cert. denied, 474 U.S. 1038, 106 S.Ct. 607,88 L.Ed.2d 585 (1985); Jones v. State, 456 So.2d 366 (Ala.Cr.App. 1983),aff'd, 456 So.2d 380 (Ala. 1984), cert. denied, 470 U.S. 1062,105 S.Ct. 1779, 84 L.Ed.2d 838 (1985).
Finally, we have searched the entire record for any plain error or defect which might have adversely affected the defendant's substantial rights and have found none. A.R.A.P., Rule 45A.
The appellant's conviction of this capital offense and his sentence of death are due to be, and they are hereby, affirmed.
AFFIRMED.
All the Judges concur.